**James H. COOKE, Plaintiff,**

**v.**

**LYNN SAND & STONE CO., Trimount Bituminous Products Co., Louis E. Guyott II, and Stuart Lamb, Defendants.**

**Civ. A. No. 85–2474–W.**

United States District Court,
D. Massachusetts.

July 18, 1986.

**15**

Victor Bass, Henry G. Stewart, Robert G. Holdway, Palmer & Dodge, Boston, Mass., for plaintiff.

Peter J. Schneider, Burns & Levinson, Boston, Mass., for Lynn Sand & Stone Co., Trimount Bituminous Products Co., Louis E. Guyott II, Stuart Lamb.

Edward Mackiewicz, James N. Delcan, Robert L. Furst, Ralph L. Landy, Pension Benefit Guaranty Corp., Washington, D.C., for Pension Benefit Guaranty Corp.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. *Introduction*

Plaintiff, James H. Cooke, has brought this action against defendants, Lynn Sand & Stone Company ("Lynn Sand"), its corporate parent, Trimount Bituminous Products

Company ("Trimount"), and two of its corporate officers, Louis E. Guyott II and Stuart Lamb. Cooke is a former officer and stockholder of Lynn Sand and administrator and trustee of the Lynn Sand Pension Plan ("the Plan"). He claims that the current trustees of the Plan committed various violations of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (as amended), in the process of terminating the Plan. Cooke also raises state law claims for breach of contract, breach of implied covenant of good faith and fair dealing, interference with advantageous relations and contract misrepresentation, and unfair and deceptive business practices under Mass.Gen.Laws c. 93A.

Cooke also brought an enforcement action against the Pension Benefit Guaranty Corporation ("PBGC"), which regulates the termination of pension benefit funds. PBGC filed a motion to dismiss that action, which was granted on December 5, 1985.

The remaining defendants have moved for summary judgment on all of Cooke's claims. Cooke has filed a cross-motion for partial summary judgment on the question of the proper interest rate to be used in calculating his lump-sum termination benefits. He argues that summary judgment may not be entered against him on his other claims. The parties have submitted numerous memoranda and exhibits in support of their motions. Jurisdiction rests on 29 U.S.C. § 1132(e). For the reasons set forth below, the court grants partial summary judgment for defendants and denies Cooke's motion for summary judgment.

## II. *Facts*

The undisputed facts of this case are as follows:

1. It is undisputed that the Lynn Sand Pension Plan was an employee pension benefit plan governed by ERISA, 29 U.S.C. § 1002(2).

2. Article XIV, § 1 reads as follows: "The Employer expressly reserves the right to amend or terminate this Agreement at any time, by action of its Board of Directors."

3. It is undisputed that ERISA does not mandate the precise form that benefits must take. *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 510,

From 1974 to May 27, 1983, plaintiff James H. Cooke was the President, Treasurer, a member of the Board of Directors, and a minority stockholder of Lynn Sand, a closely-held corporation. He also served as the Administrator and Trustee of the Plan.[1]

On May 18, 1983, Trimount purchased all of Lynn Sand's outstanding common stock, thus becoming Lynn Sand's corporate parent. The new Lynn Sand management, which included defendants Stuart Lamb, as President, and Louis E. Guyott II, as Treasurer, terminated Cooke's employment on July 8, 1983. On September 7, 1983, Lynn Sand's newly-constituted Board of Directors voted to remove Cooke from his position as Trustee and Administrator of the Plan. Lamb and Guyott became the new Trustees and Plan Administrators on that date.

On December 10, 1983, the new Trustees notified Cooke that Lynn Sand was terminating the Plan pursuant to Article XIV, § 1 of the 1980 Plan.[2] The effective date for termination was December 31, 1983. In November, 1983, Lynn Sand also notified the PBGC of its intention to terminate the Plan, as required by 29 U.S.C. § 1341(a).

In May of 1984, Cooke received a letter from Guyott, dated May 1, 1984, offering him an election between receiving (1) a fully paid-up annuity of $1,856.93 per month to start at age 65 and stop at death or after 120 payments, which ever came first, or (2) a lump-sum actuarial equivalent of this annuity amounting to $58,987.98. The letter informed Cooke that if he did not make an election, the Trustees would automatically provide him with the annuity option.[3]

101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981); *Pompano v. Schiavone & Sons, Inc.,* 680 F.2d 911, 914 (2d Cir.), *cert. denied,* 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982). Rather, benefits are to be distributed in accordance with the terms of the Plan. It is also undisputed that under the terms of the Lynn Sand Plan, the Trustees had the discretion to offer beneficiaries either an annuity or the lump-sum benefit option. *See* Art. IX, § 3(a) and Art. IV, § 2 of the 1980 Plan.

On May 22, 1984, Cooke's counsel wrote to Guyotte and Lamb seeking additional information on how they calculated Cooke's lump-sum benefit. On May 24, 1984, Guyotte sent a letter to Cooke giving him until June 4, 1984 to make an election between the annuity and lump-sum options. On May 25, Cooke's counsel responded with a letter informing Guyott and Lamb that Cooke desired the lump-sum benefit option but contested Lynn Sand's calculation of the amount due to him. He sought to accept the $58,987.98 offered by Lynn Sand without prejudice to his right to the additional benefits to which he claimed he was entitled. On June 4, the Plan's counsel provided Cooke with the actuary's calculation of Cooke's lump-sum benefit and requested that Cooke make an election by June 8, 1984.

On July 12, 1984, Cooke's counsel wrote to the Plan's counsel contesting the Trustees' calculation, informing Lynn Sand that Cooke had filed an objection to the termination proceedings with the PBGC, and stating that the Trustees had no authority to distribute termination benefits until the PBGC had issued a Notice of Sufficiency.[4] In the meantime, on June 24, 1984, Cooke's counsel had written to the PBGC requesting that it withhold Lynn Sand's Notice of Sufficiency.

On July 23, 1984, counsel for the Plan wrote to Cooke's counsel telling him that the Trustees were treating Cooke's complaint as a claim for benefits, as required by 29 C.F.R. § 2560.503-1(d), and gave a detailed explanation for why his claim for higher benefits was denied. On August 2, 1984, Cooke made a claim for review of this decision. This appeal was denied on November 30, 1984, in another detailed letter from the Plan's counsel. With this letter the Trustees also sent Cooke a check for $4,921.84, representing the principal and accumulated interest on voluntary contributions that Cooke had made pursuant to Article VIII of the Plan.

On September 24, 1984, the PBGC issued a Notice of Sufficiency. Cooke filed a Request for Reconsideration of this decision on October 22, 1984. The PBGC summarily denied this request on May 8, 1985.

On June 14, 1985, Cooke filed a complaint in this court.[5] He raises claims under ERISA, as well as Massachusetts law. Defendants have moved for summary judgment on all of Cooke's claims. Cooke has filed a cross-motion for partial summary judgment on the issue whether the Trustees acted arbitrarily, capriciously, in bad faith, or in breach of their fiduciary duties by using an excessive interest rate in calculating his lump-sum benefit payment. He argues that summary judgment is inappropriate on his other claims. Defendants have agreed that Cooke need not make an election between the annuity and lump-sum benefits options until ten days after final judgment is entered in this action.

### III. *Legal Standards*

In deciding the pending motion the court has applied the following principles regarding motions for summary judgment and the standard of review of a trustee's interpretation and implementation of the terms of a pension plan.

### A. *Summary Judgment Standard*

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56(c), the court may grant summary judgment only "if the pleadings, deposi-

---

4. The PBGC must find that a pension plan has sufficient assets to discharge its liabilities and obligations before the Trustees may begin paying termination benefits. 29 U.S.C. § 1341(b). If a plan terminates with insufficient assets, the PBGC ordinarily becomes a statutory trustee of the plan and pays the plan's participants and beneficiaries the amounts guaranteed by the PBGC pursuant to ERISA. 29 U.S.C. §§ 1322, 1361.

5. Cooke has also brought an action in Massachusetts Superior Court charging Lynn Sand, Trimount, and Lamb for breach of contract, wrongful discharge, breach of common law rights of employment, interference with advantageous relations and contract, unfair and deceptive business practices, harm to third-party beneficiaries by breach of interest, fraudulent securities practices, and common law misrepresentation. The existence of the State suit and this action indicate acrimony surrounding Cooke's discharge.

tions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In addition, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Transportation Corp.*, 722 F.2d 922, 928 (1st Cir.1983) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)).

For the purposes of the instant case, it is important to note that a court must ordinarily be "particularly cautious" about granting summary judgment in cases involving the intent or motive of one of the parties. *Stepanischen*, 722 F.2d at 928. The presence of a state of mind issue does not, however, "automatically preclude summary judgment." *Id.* at 929. The party opposing the motion must give some indication that "he can produce the requisite quantum of evidence" to entitle him to a trial. *Hahn*, 523 F.2d at 468; *Velazquez v. Chardon*, 736 F.2d 831, 833 (1st Cir.1984); *Stepanischen*, 722 F.2d at 929.

However, in cases where intent or motive is at issue there is seldom direct evidence of a party's motivation. Thus, before granting summary judgment, "the court should ask itself whether [the non-movant] could prevail if a jury or judge believed [his] version of the facts and disbelieved [the movant's] version." *Id.*

B. *Standard of Review of Trustees' Actions*

■ It is well-settled in the area of ERISA-governed pension plans that a court may not overturn the trustee's interpretation of the plan unless it is arbitrary, capricious, without rational basis, or made in bad faith. *Jestings v. New England Tel.*

*and Tel. Co.*, 757 F.2d 8, 9 (1st Cir.1985); *Govoni v. Bricklayers, Masons & Plasterers Int'l Union, Local No. 5 Pension Fund*, 732 F.2d 250, 252 (1st Cir.1984); *Miles v. New York State Teamsters Conference Pension and Retirement Fund, Etc.*, 698 F.2d 593, 599 (2d Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed. 2d 108 (1983) ("lawful, discretionary acts of pension committee should not be disturbed, absent a showing of bad faith or arbitrariness"); *Rueda v. Seafarers Int'l Union of North America*, 576 F.2d 939, 942 (1st Cir.1978). Where the trustees and a disappointed applicant each offer a reasonable interpretation of a term in a pension plan, the trustees' interpretation will ordinarily prevail. *Miles*, 698 F.2d at 601. However, the court's decision regarding alleged arbitrary, capricious, irrational, or bad faith decisions must be made "in light of the trustee's responsibility to all potential beneficiaries." *Palino v. Casey*, 664 F.2d 854, 858 (1st Cir.1981); *Rueda*, 576 F.2d at 942.

■ In addition, where it is found that the conduct of the trustees of a pension fund has been arbitrary, capricious, or in bad faith, it is likely that they have also breached their fiduciary responsibility under ERISA to discharge their duties for the sole benefit of plan participants and their beneficiaries. *See Fentron Industries v. National Shopmen Pension Fund*, 674 F.2d 1300, 1307 (9th Cir.1982) ("[A] trustee may be found to have violated his fiduciary duty only when his or her action was 'made in bad faith, or upon a lack of a factual foundation, or when unsupported by substantial evidence.' *Tomlin v. Bd. of Trustees*, 586 F.2d 148, 150 (9th Cir.1978)."); *Palino*, 664 F.2d at 858 (whether trustees' conduct breached their fiduciary duties depends on whether their actions were "arbitrary and capricious in light of the trustees' responsibilities to all potential beneficiaries.").[6]

6. ERISA's fiduciary standards are set forth in § 404(a)(1)(A)–(D):

(a) **Prudent man standard of care.** (1) Subject to sections 403(c) and (d) [29 USCS § 1103(c) and (d)], 4042 [29 USCS § 1342], and 4044 [29 USCS § 1344], a fiduciary shall

discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

As the Second Circuit Court of Appeals has stated:

> [ERISA] imposes an unwaivering duty on an ERISA trustee to make decisions with a single-minded devotion to a plan's participants and beneficiaries and, in so doing, to act as a prudent person would act in a similar situation. These familiar principles evolved from the common law of trusts that Congress codified and made applicable to ERISA trustees.

*Morse v. Stanley,* 732 F.2d 1139, 1145 (2d Cir.1984). The trustee also has an obligation to deal "impartially" and "evenhandedly" among a plan's participants and beneficiaries. *Id.* "[A]t the slightest suggestion that any action taken was with other than the beneficiaries in mind, a trustee is subject to liability for resulting injury that the beneficiaries may suffer." *Id.*

The court has addressed Cooke's claims for relief in the context of these standards.

## IV. *Conclusions of Law*

Cooke's complaint raises claims under ERISA and state law. Cooke's first ERISA claim is that the Trustees of the Plan violated ERISA by miscalculating the lump-sum benefits to which he was entitled. Specifically, he argues that the Trustees used a 9.5% discount or interest rate as suggested by PBGC regulations, rather than the rates set forth in the Plan, in order to minimize the Plan's obligations to him. By doing so, Cooke contends that the Trustees acted arbitrarily, capriciously, in bad faith, or in breach of their fiduciary duties under ERISA. He also claims that the Trustees used the wrong starting date for calculating his years of service under the Plan. In addition, Cooke contends that the Trustees have not paid him the correct amount of interest on his voluntary contribution of $4,094.73.

Cooke's next claim under ERISA is that Lynn Sand is not entitled to keep the residual assets of the terminated Plan, no matter what amount they are ultimately determined to be.

Cooke's final claim under ERISA is that the Trustees committed various procedural violations of the statute and corresponding regulations.

Cooke also raises several claims under state law. He alleges that the defendants' behavior in this matter constituted a breach of contract, breach of implied covenant of good faith and fair dealing, interference with advantageous relations and contract, and misrepresentation. Cooke further alleges that defendants' conduct amounted to unfair and deceptive practices in violation of Mass.Gen.Laws c. 93A.

For the reasons stated below, the court concludes that defendants are entitled to partial summary judgment. Specifically, the court finds that:

(1) Summary judgment is not appropriate with regard to the interest rate issue because Cooke has raised material disputed facts as to whether the Trustees' acted in good faith and in conformity with their fiduciary duties in using the 9.5% rate;

(2) Defendants are entitled to summary judgment concerning the issue of the starting date for the calculation of benefits because the Trustees did not act arbitrarily,

---

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent no to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title or title IV.

29 U.S.C. § 1104(a)(1)(A)–(D). It should be noted that at least one court has held that the fiduciary standards do not apply to a trustee's decision to terminate a pension plan. *District 65, UAW v. Harper & Row Publisher's, Inc.,* 576 F.Supp. 1468, 1477–78 (S.D.N.Y.1983). The *District 65* case is distinguishable, however, because here Cooke attacks the methods used by the Trustees in distributing termination benefits; he does not challenge the termination decision itself. Thus, the court finds that the Trustees' conduct in this case is subject to review under ERISA's fiduciary standards. The parties do not dispute this conclusion.

capriciously, or in bad faith by using an effective date of 1964, rather than 1958;

(3) Summary judgment is not appropriate on the issue of whether the Trustees paid Cooke the proper amount of interest on his voluntary contribution of $4,094.73;

(4) Lynn Sand is entitled to receive the Plan's residual assets, but summary judgment is not appropriate as to the amount of this reversion;

(5) Cooke does not oppose summary judgment on his claims of procedural deficiencies. In any case, he was not prejudiced by the Trustees alleged procedural violations of ERISA and corresponding regulations and therefore has no standing to maintain such claims; thus, summary judgment for defendant is granted on those claims; and

(6) Cooke has not opposed summary judgment of his state law claims which are, in any event, preempted by ERISA; thus summary judgment for defendant is granted on those claims.

### A. *The Proper Interest or Discount Rate*

■ The Trustees calculated Cooke's lump-sum benefit option by using an interest or discount rate of 9.5%. This lump-sum benefit is a calculation of the present value of the flow of annuity payments that Cooke could have elected to receive upon reaching age 65. In making this calculation, the higher the interest rate used, the lower the lump-sum benefit. In calculating present values, the interest rate is also referred to as the discount rate. Cooke claims that Plan required the Trustees to use a 6% rate in discounting his future benefits for the years leading up to his retirement age and a rate specified by the Mutual Benefit Life Insurance Company in discounting his benefits for years after Cooke reached 65. *Cooke asserts that his lump sum benefit would have been at least $30,000 more if the Trustees had used the Plan rates.*

The Trustees' decision to use the 9.5% rate relates to Article XIV of the Plan. Article XIV, § 2 provides, in pertinent part, that the Trustee "shall allocate the assets of the [terminated] Plan in accordance with Section 4044 of the Employee Retirement Security Act of 1974...." Section 4044 of ERISA, 29 U.S.C. § 1344, establishes rules for the allocation of assets of terminating pension plans. Pursuant to § 4044, the PBGC has promulgated regulations defining the acceptable methods for calculating lump-sum, actuarially-equivalent distributions of termination benefits. For the purposes of determining whether a terminating plan has sufficient assets to cover its liabilities, the PBGC requires the plan administrator to specify the actuarial assumptions used in calculating benefits due to plan participants. 29 C.F.R. § 2619.26. In calculating lump-sum benefits, the PBGC considers it reasonable to use either the interest rate specified in the plan, § 2619.26(c)(2)(i), or the PBGC interest rate for immediate annuities in effect on the particular valuation date, § 2619.26(c)(2)(iv)—which in this case is 9.5%.

Cooke responds that § 1.09 of the Adoption Agreement of the Plan ("Adoption Agreement") specifically states that:

> For the purposes of establishing actuarial equivalence, benefit payments shall be discounted only for mortality and interest based on the following:
>
> \*    \*    \*    \*    \*    \*
>
> (c) Pre-retirement interest    6%
> Mortality    None
> Post-retirement interest    Mutual Benefit Life Insurance Company Guaranteed Purchase Rate Applicable to Each Contract

According to Cooke, the clear language of the Plan required the Trustees to use a pre-retirement interest rate of 6% and a post-retirement rate specified by the Mutual Benefit Life Insurance Company.[7]

The Trustees argue that they have chosen one of two reasonable interpretations of the terms of the Plan. They interpreted

---

7. Presumably, the Plan purchased annuity contracts for retiring participants from the Mutual Benefit Life Insurance Company ("MBLIC") and thus used the MBLIC interest rate in discount-ing payments in the years in which each participant would receive post-retirement pension benefits.

Article XIV, § 2 to create a distinction between ongoing and terminating plans for the purpose of determining the actuarial equivalence of lump-sum benefits. If the Plan were ongoing, they would have to apply the Plan rates specified in the Adoption Agreement. However the language of Article XIV, § 2 and the PBGC regulations made it reasonable for them to use the PBGC's recommended rates *or* the Plan rates in calculating lump-sum benefits upon termination of the Plan. As a result, defendants argue that their decision must be affirmed because it was not arbitrary, capricious, or without rational basis. *Jestings,* 757 F.2d at 9; *Govoni,* 732 F.2d at 252.

Cooke argues that there is no basis for defendants' distinction between ongoing and terminating plans. He further argues that the only reasonable interpretation of the PBGC regulations, 29 C.F.R. § 2619.26(c)(2), is that PBGC's recommended rates may only be used if the pension plan itself does not require the use of a specific rate. The Lynn Sand Plan does specify a particular rate. Thus, the Trustees use of the PBGC rate was unreasonable, according to Cooke.

Cooke also contends that certain revenue rulings issued by the Internal Revenue Service ("IRS"), which have since been incorporated into ERISA and the Internal Revenue Code ("the Code") through the Retirement Equity Act of 1984 ("REA"), Pub.L. No. 98–397, 98 Stat. 1450, § 301 (1984), confirm that the Trustees violated ERISA by using the 9.5% interest rate. For example, Revenue Ruling 79–90 requires a tax-qualified pension plan to specify the interest rate and mortality assumptions used in determining actuarily-equivalent, optional benefits to satisfy the "definitively determinable benefit" requirement of Treasury Regulation § 1.401(b)(1)(ii). Rev.Rul. 79–90, 1979–1 C.B. 155. Revenue Ruling 79–

90 further states that these actuarial assumptions "must be specified within the plan in a manner which precludes employer discretion," and that any plan that has already specified such actuarial assumptions may not remove them. *Id.* at 156.[8]

Cooke also relies on Revenue Ruling 81–12, which states that plan amendments may not change actuarial assumptions in a way that would reduce a participant's accrued benefits. Rev.Rul. 81–12, 1981–1 C.B. 228, 229.[9]

Defendants have several responses to these arguments. First, these revenue rulings must apply only to ongoing plans, otherwise they would invalidate the termination provisions of the PBGC regulations, 29 C.F.R. § 2619.26, which give the Trustees discretion in choosing the interest rate for calculating actuarially-equivalent termination benefits. Defendants point to the fact that in another revenue ruling, the IRS expressly approved the use of PBGC's recommended interest rate for terminating plans. Rev.Ruling 83–52, 1983 C.B. 87.[10] In addition, defendants argue that Revenue Ruling 81–12, and the corresponding provisions of the REA apply only to plan amendments. In the instant case, the Trustees interpreted the pre-existing terms of the Plan. They did not alter or amend the Plan in any way, according to defendants. Similarly, Revenue Ruling 79–90, requiring the specifications of actuarial assumptions, was incorporated into the Internal Revenue Code, but not ERISA. *See* n. 8, *supra.* Since Cooke has no private right of action under the Internal Revenue Code, his appeal to Revenue Ruling 79–80 is inapposite, according to defendants.

Cooke's final two arguments are directed at the propriety and motivation of the Trustees' decision. First, Cooke contends that the Trustees discriminated against him by using a 9.5% interest rate to calculate

---

8. These provisions of Revenue Ruling 79–90 were incorporated into the Internal Revenue Code by the § 301(b) of the REA, 26 U.S.C. § 401(a)(25). However, they were not incorporated into ERISA.

9. The REA, § 301(a), (b), incorporated this provision into both the Internal Revenue Code, 26

U.S.C. §§ 411–12, and ERISA, 29 U.S.C. § 1054(g).

10. Revenue Ruling 83–52 was modified and superseded on other grounds by Revenue Ruling 85–6, 1985–1 C.B. 133.

his lump-sum benefits, but a 6% rate to calculate the lump-sum benefits of another employee, Ronald Tarman, who received his benefits before the Plan was terminated. Defendants respond that since Tarman was paid before the Plan was terminated, Cooke's discrimination argument merely supports their position that the proper, pre-retirement discount rate was 6% for the ongoing plan and 6% or 9.5% for the terminating plan. Defendants contend that in any case the Trustees were entitled to treat Cooke differently than Tarman. Specifically, they argue that it is well established that the discretionary distribution of relatively small lump-sums to participants in the past does not prevent trustees from subsequently denying requests for lump-sum benefits or, as in this case, calculating those benefits with a higher discount rate, where the later participant's benefits are much greater than those previously paid. *Morse v. Stanley*, 732 F.2d 1139, 1143–46 (2d Cir.1984); *Fine v. Semet*, 699 F.2d 1091, 1094 (11th Cir.1983); *Pompano v. Schiavone & Sons, Inc.*, 680 F.2d 911, 914–15 (2d Cir.), *cert. denied*, 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982).

Cooke's second contention regarding the Trustees' motivation is that they violated their fiduciary duty and acted in bad faith by applying an excessive interest rate assumption in order to minimize the present value of his benefits. *See District 65, UAW v. Harper & Row Publishers, Inc.*, 576 F.Supp. 1468, 1479 (S.D.N.Y.1983) (denial of defendant's motion for summary judgment because plaintiff alleged that the trustees used a 15 percent interest rate to minimize the present value of the participant's accrued benefits and maximize the amount of residual assets). Defendants have not directly responded to this last argument.

The court finds first that plaintiff and defendants have both proposed facially rea-

sonable interpretations of the Plan's terms. Defendants' interpretation is reasonable because the provisions of the plan are ambiguous as to whether the Plan rates or the rates recommended by the PBGC regulations should be applied upon termination of the Plan. Article XIV, § 2 expressly provides that the assets of the terminating Plan must be allocated in accordance with § 4044 of ERISA, 29 U.S.C. § 1344. The regulations promulgated pursuant to § 4044 clearly offer the Trustees the option of using the Plan rates or the PBGC's recommended rates.[11]

In addition, § 1.09 of Adoption Agreement, which contains the Plan's discount rates for determining actuarial equivalence, when read in conjunction with Article XIV, § 2, is susceptible to defendant's interpretation that the Trustees must apply the Plan rates when the Plan is ongoing, but may refer to the PBGC regulations when the Plan is terminating. These regulations give the Trustees the flexibility to use the Plan rates or the PBGC recommended rates. 29 C.F.R. § 2619.26(c)(2). In any case, § 1.09 of the Adoption Agreement does not expressly state that the Plan rates must be applied when the Plan is terminating.

The IRS revenue rulings cited by Cooke do not alter the court's conclusion on this point. First of all, Revenue Ruling 79–80 requires the Trustees to specify the actuarial assumptions that they intend to use in calculating optional, actuarially-equivalent benefits. The Trustees have satisfied this requirement. Under their interpretation of the Plan, they are required to use the Plan rates for calculating lump-sum benefits when the Plan is ongoing, but pursuant to 29 C.F.R. § 2619.26(c)(2), may use either the Plan rates or the PBGC's recommended rate when the Plan is terminating. In this sense, the Plan specifies its actuarial as-

---

11. Article XIV, § 4 of the Plan guarantees that in the event of termination, all participants "shall have a nonforfeitable interest in their Accrued Benefit to the extent then funded." However, this clause only assures participants a right to claim their benefits; it does not guarantee a specific level of benefits upon termination of a pension plan. *Cf. Alessi v. Raybestos–Man-*

*hattan, Inc.*, 451 U.S. 504, 512, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981) ("The statutory definition of 'nonforfeitable' assures that an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or a method for calculating the benefit.").

sumptions for calculating lump-sum benefits in a way that sufficiently limits the Trustees' discretion. In any case, Revenue Ruling 79–80 was incorporated into the Internal Revenue Code, but not ERISA. *See* n. 8, *supra.* Cooke does not appear to contend that he has a private right of action under the Code. For these reasons, the court finds Cooke's appeal to Revenue Ruling 79–90 unpersuasive.

Plaintiff's appeal to Revenue Ruling 81–12 and the corresponding provisions of the ERISA, 29 U.S.C. § 1054(g), is similarly unavailing because they apply only to plan amendments. In the instant case, the Trustees have interpreted the pre-existing provisions of the Plan; they have not amended the Plan. Revenue Ruling 81–12 and the corresponding provisions of ERISA are therefore inapposite.

However, the court finds that it would have been at least equally reasonable, and perhaps more reasonable, for the Trustees to have adopted Cooke's interpretation of the Plan's terms. That is, because of the arguable ambiguity of its termination provisions, the Trustees reasonably could have read the Plan to require that the interest rates stated in § 1.09 of Adoption Agreement be used for determining the actuarial equivalence of lump-sum benefits, whether the Plan was ongoing or terminating. There is no term in the Plan, or the PBGC regulations, which would have prevented the Trustees from using the Plan's rates. In fact, defendants concede that the Trustees reasonably could have used the Plan's rates pursuant to the PBGC regulations.

As stated above, *see* § III.B., *supra,* when the Trustees and a disappointed claimant have both offered reasonable interpretations of the terms of a pension plan, the Trustees' interpretation should ordinarily be followed. *Miles,* 698 F.2d at 601. In this case, however, Cooke has also raised a serious factual question as to whether the Trustees decision was made in good faith. In essence, he alleges that the Trustees acted in bad faith and breached

their fiduciary duties by discriminating against him and by using the 9.5% discount rate to minimize the benefits paid to participants, while maximizing the residual assets that would revert to Lynn Sand.

In essence, Cooke has alleged that the Trustees have not only failed to treat him "evenhandedly," but have taken actions to benefit the owners of Lynn Sand, at the expense of the Plan's participants and beneficiaries. If Cooke can prove these allegations at trial, the Trustees will be liable for breach of their fiduciary duty under ERISA. *See Morse,* 732 F.2d at 1145.

As previously stated, summary judgment is generally inappropriate, although not necessarily precluded, where the motive or intent of one of the parties is a disputed issue. *Stepanischen,* 722 F.2d at 929. The court must determine "whether plaintiff could prevail if a jury or judge believed plaintiff's version of the facts and disbelieved defendant's version." *Id.* In this case, the court finds the plaintiff could previal in establishing that the trustees acted in bad faith.

If viewed in the light most favorable to Cooke, the facts are as follows. Trimount bought Lynn Sand, a closely held business, from its shareholders. Trimount then hired new managers for Lynn Sand. The new management promptly discharged Cooke and removed him as Trustee and Administrator of the Plan. Next, the new Trustees voted to terminate the Plan. As part of the termination process, the new Trustees calculated Cooke's, and presumably other participants' lump-sum benefits, using an interest rate of 9.5%, which left Cooke with at least $30,000 less in benefits and resulted in a reversion to the company of over $130,000. They chose this 9.5% rate even though, by their own admission, they reasonably could have used the lower Plan rates. If the Trustees had used the lower rates, the Plan still would have had sufficient assets to cover all of its liabilities and obligations.[12]

---

12. The PBGC concluded that the Plan had sufficient assets to cover its liabilities and obligations whether the Trustees used the 9.5% or

the Plan Rates. It does not appear that the PBGC addressed the question whether the Trust-

Plaintiff also alleges that a series of letters that the Trustees sent to him from May to July, 1984, evidence an effort to coerce him into accepting benefits calculated with the 9.5% rate. He further contends that the Trustees calculated the benefits of at least one other participant using the lower Plan rates.

Thus, plaintiff asserts that these facts establish that the Trustees acted arbitrarily, capriciously, in bad faith, and in breach of their fiduciary duties, first by choosing the 9.5% rate to minimize the participants' benefits and maximize Lynn Sand's reversion and, second, by discriminating against him and trying to force him to accept their calculation of his lump-sum benefit.

Viewing these facts and allegations in the light most favorable to Cooke, the court concludes that Cooke has raised a disputed issue as to the Trustees' motivation for using the 9.5% interest rate to calculate Cooke's lump-sum benefits. If a jury believes plaintiff's version of the facts, it could reasonably find that the Trustees had an improper motive for using the 9.5% interest rate rather than the Plan rates in calculating the value of Cooke's benefits. At a minimum, a jury could reasonably find that the Trustees acted arbitrarily, capriciously, and/or in bad faith, and also violated their fiduciary duties to the participants and their beneficiaries by attempting to maximize the amount which would revert to Lynn Sand by minimizing the benefits

paid to the participants. *See District 65, UAW v. Harper & Row Publishers, Inc.,* 576 F.Supp. 1468, 1479 (S.D.N.Y.1983) (summary judgment inappropriate where the plaintiff alleges that the trustees used a 15 percent interest rate to minimize the present value of the participants' accrued benefits and maximize the amount of residual assets). Based on the totality of the circumstances, a jury could also reasonably find that the Trustees intended to discriminate against Cooke personally. As a consequence, if the jury finds the Trustees had an improper motive for interpreting the Plan as they did, their conduct would have been impermissible even though their interpretation of the Plan's provisions was facially reasonable.

In view of the existence of a disputed material issue as to the Trustees' motivation, defendant's motion for summary judgment on the interest rate issue must be denied.

The court notes that its conclusion might have been different had defendants, who have the burden of showing that their motion for summary judgment should be granted, offered a reasonable explanation for why the Trustees used the 9.5% rate when they properly could have used the lower Plan rates and still left the Plan with sufficient assets to satisify its liabilities. Defendants provided no such explanation.[13]

---

ees acted in conformity with the Plan by using the 9.5% rate.

13. The only attempted explanation offered by defendants for using a 9.5% rate is self-defeating. Defendants contend that ongoing plans need to use conservative interest rates in calculating lump-sum benefits to protect against "the possibility of significant unfunded vested liabilities to Plan participants which can be amortized only by employer contributions coming in over an indefinite period of time...." Defendants' argument continues:

In contrast, benefits under a terminated defined benefits pension are 'funded up'; there will be no future contributions, and the plan's assets (such as they are) are available for immediate dedication to individual annuity contracts at market rates. In this latter case, the use of the then prevailing higher ... PBGC rates is the more realistic approach.

Defendants' Initial Memorandum in Support of Their Motion for Summary Judgment at 18–19.

The court understands defendants' position to be that the lower, more conservative interest rates should be used in calculating lump-sum benefits while a plan is ongoing, but that higher, less conservative rates may be used when a Plan is terminating. Defendants' analysis is defective because, for the purposes of calculating lump-sum benefits, a higher interest or discount rate is *more* conservative from the Plan's perspective. The higher the interest rate, the lower the lump-sum payments, and the lower the Plan's total liabilities to its participants. If defendants had properly applied their stated financial principles, they would have used the higher, more conservative 9.5% rate while the Plan was ongoing, and the lower Plan rates while it was terminating. Instead, they did just the opposite. Thus, defendants' only apparent rationale for using the 9.5% rate instead of the Plan rates is not persuasive.

The court also notes that today's conclusion is influenced by, but does not rest upon, the fact the Trustees calculated Ronald Tarman's benefits with the Plan discount rate, but used a 9.5% rate to calculate Cooke's benefits. Since Tarman's benefits were paid before the Trustees decided to terminate the Plan, this use of different interest rates in calculating Tarman's and Cooke's lump-sum payments is, on its face, consistent with their contention that they were required to apply the Plan rates before termination, but had discretion to use the 9.5% rate after termination. Nonetheless, in each of the cases that defendants cite to support this kind of differential treatment, the court, *after a trial on the merits*, found that the Trustees acted in good faith and in the best interests of the other Plan participants by denying the plaintiff's request for benefits in circumstances in which such requests had been granted in the past. *Morse*, 732 F.2d at 1143–46 (trustees' denial of accelerated lump-sum payment to plaintiffs upheld, even though such payments had been made in the past, because in this case such payments would not have been in best interests of remaining participants); *Fine v. Semet*, 699 F.2d 1091, 1094–95 (11th Cir. 1983) (trustees' denial of lump-sum payment upheld, even though previous lump-sum payments had been made, because payments here "would have had a greater impact on the plan's assets as a whole than had the previous requests"); *Pompano v. Schiavone*, 680 F.2d 911, 914–15 (2d Cir.), *cert. denied*, 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982). Here, defendants have offered no rational financial explanation for why they used the higher interest rate in calculating Cooke's benefits, but used the Plan rates to calculate Tarman's benefits. *See* note 13, *supra* (defendants' only financially-based reason for using the 9.5% rates is analytically self-defeating). Thus, viewing the record in the light most favorable to Cooke, there is sufficient evidence in the record to put in dispute the Trustees' motivation for using the higher discount rate in calculating Cooke's benefits than Tarman's benefits.

Cooke's cross-motion for summary judgment on the interest rate issue must also be denied. In analyzing Cooke's motion, the court must view the facts in the light most favorable to the defendants. Thus, given the court's finding that the Trustees' interpretation of the Plan was facially reasonable, if a jury believed defendants' version of the facts, it reasonably could find that the Trustees did not have an improper motive for using the 9.5% rate and thus did not act arbitrarily, capriciously, or in bad faith by doing so.

In sum, the court holds that summary judgment is inappropriate on the issue whether the Trustees should have used the Plan rates rather than the PBGC's recommended rates.

## B. *The Starting Date for Cooke's Benefit Calculations*

██ Cooke contends that the Trustees used the wrong starting date for calculating his benefits. Defendants maintain that, if anything, they could have used a later, rather than earlier, starting date than the one they chose. The court finds that summary judgment should be granted for defendants on this issue.

Cooke had a personal employment contract with Lynn Sand dated September 29, 1958, which provided him with retirement benefits if certain conditions were met. In 1964, Lynn Sand established a Pension Plan for non-managerial employees ("1964 Non–Management Plan"). In 1971, Lynn Sand first established a comparable pension plan for managerial employees like Cooke ("1971 Management Plan"). In 1976, the 1964 Non–Management Plan was merged with the 1971 Management Plan. The new plan document for this merged pension fund was not created until 1980 ("1980 Plan"). The 1980 Plan, which is the document under which this controversy arises, retained an effective date of 1964.

Cooke maintains that the Trustees should have used a starting date of 1958, rather than 1964, when calculating his benefits. Defendants contend that the Trustees could have used a starting date of 1971,

but gave Cooke the benefit of the doubt by using the 1964 date.[14]

Cooke concedes, as he must, that there is no express provision in either the 1971 or 1976 Management Plans, or the merged 1980 Plan, that incorporates his years of service from 1958 to 1964 into the 1980 Lynn Sand Pension Plan. To the contrary, § 2.01 of the Adoption Agreement provides that: "Every Employee *on the Effective Date of this Plan* ... shall become a Participant as of the Effective Date or the Anniversary Date nearest to the completion of the eligibility requirements" of having attained the age of 25 and completed at least one year of service. (Emphasis added.) Since the 1980 Plan still carried an effective date of 1964, and since Cooke had met the eligibility requirements as of that date, the Trustees calculated Cooke's benefits using a starting date of December 5, 1964. Despite the clear language of the Plan, Cooke seeks additional discovery to determine whether there is documentary, collateral evidence showing that his years of service from 1958 to 1964, under personal contract, were incorporated in the 1980 Plan.

The court concludes that summary judgment should be granted for defendants on this issue. The clear language of the 1980 Plan indicates that it was not arbitrary or capricious for the Trustees to use the 1964 starting date. *See Higgins v. Carpenters Health & Welfare Fund,* 524 F.Supp. 601, 605–06 (E.D.Pa.1981) (participant not entitled to credit for service prior to effective date where he did not meet plan's express requirements for receiving such a credit). *Cf.* 29 C.F.R. § 2530.204–1(b)(1) (trustees may disregard service before employee becomes a participant). If there were any other documents supporting Cooke's position, he should at least have a general idea of their existence and content, as he was the Plan Administrator and Trustee until September, 1983. But Cooke has not alleged any facts to support his request for additional discovery.

This issue is significantly different from the controversy over the proper interest rates. With respect to the interest rate issue, Cooke raised material disputed facts concerning the Trustees motive for choosing the 9.5% rate in a situation in which ambiguity within the Plan offered them discretion. With regard to the starting date for calculations, Cooke has not alleged any facts that could support a finding that the Trustees acted in bad faith or breached their fiduciary duty by using the 1964 starting date. The clear language of the Plan did not allow the Trustees to choose an earlier date. While the Plan might have arguably permitted the Trustees to use 1971 as the starting point, their selection of 1964 benefitted Cooke. Summary judgment is therefore granted for defendants on the starting date issue.[15]

## C. *Cooke's Voluntary Contribution*

It is undisputed that Cooke contributed $4,094.73 to the Plan pursuant to Article VIII. It is also uncontested that the Trustees paid Cooke $4,094.73 plus $827.11 in interest on November 30, 1984. The Trustees assert that they calculated this interest by using the average return on the Plan's portfolio of investments and a starting date of March 25, 1982. Cooke maintains that he made the voluntary contribution on January 1, 1981. Cooke also contests the rate of return applied to his contribution.

The court finds that, reading the record in the light most favorable to Cooke, defendants' motion for summary judgment on the issue of Cooke's voluntary contributions must be denied because Cooke has raised material issues of disputed fact as to when he made his voluntary contribution and the amount of interest his contribution actually earned.

---

**14.** Under the Plan's method for calculating benefits, *see* 1.07(a) of the Adoption Agreement, the more years of service that a participant has— *i.e.,* the earlier his starting date—the more benefits to which the participant is entitled.

**15.** The court's conclusion does not prejudice Cooke's right to argue in his state court action that defendants breached his 1958 employment contract by failing to pay benefits due to him under the provisions of that agreement.

## D. *Reversion of Residual Assets*

■ It is undisputed that the Trustees filed Form 5130 with the PBGC reporting that $130,024.00 in residual assets would be reverting to the Plan. Cooke concedes that Article XIV, § 2 of the Plan expressly provides that "[a]ny residual assets of the Plan shall be returned to the Employer after all liabilities of the Plan to Participants and their beneficiaries have been satisfied." Section 4044(d)(1) of ERISA further provides that "[a]ny residual assets of a single-employer plan may be distributed to the employer if—(A) all liabilities of the plan to participants and their beneficiaries have been satisfied, (B) the distribution does not contravene any provision of law, and (C) the plan provides for such distribution in these circumstances." 29 U.S.C. § 1344(d)(1). *See Washington–Baltimore Newspaper Guild Local 35 v. Washington Star Co.,* 555 F.Supp. 257, 261–64 (D.D.C. 1983).

Despite this seemingly unambiguous authority, Cooke contends that defendants are not entitled to reversion of residual assets in any amount. Cooke first argues that defendant Trimount is the entity most likely to receive the benefit of a reversion. As such, a reversion would constitute unjust enrichment because Trimount never contributed to the Plan. This argument is unpersuasive. When Trimount bought Lynn Sand from the company's shareholders, it purchased all of Lynn Sand's assets, including any reversionary interest that might result from the termination of the Lynn Sand Pension Plan.

Cooke's second argument is that Lynn Sand is not entitled to a reversion because the residual assets provision of the Summary Plan Description ("SPD") contradicted the terms of the Plan. Specifically, the SPD states that "[i]n no event can any funds contributed to the plan revert to, or be used by the Employer."

ERISA requires plan administrators to furnish plan participants and beneficiaries with an SPD explaining their rights under a pension plan. 29 U.S.C. § 1022. In addition, trustees must provide an SPD explaining any modificiation or change in a plan within 210 days of the end of the year in which the plan was modified. 29 U.S.C. § 1024.

The reversionary clause of Article XIV, § 2 first appeared in the 1976 Management Plan. The Trustees therefore had an obligation to amend the SPD within 210 days of the end of the 1976 Plan year to reflect the addition of the reversionary clause. No such amendment to the SPD was ever made. Instead, the SPD continues to state that under no circumstances may the assets of the Plan revert to the Employer.

Cooke was the Plan Administrator and Trustee in 1976. As such, he is primarily responsible for the failure to amend the SPD to conform with the reversionary clause of Article XIV, § 2. In addition, Cooke is only entitled to rely on a deficiency in the SPD if he has been prejudiced by the defect. *Govoni,* 732 F.2d at 252. As a former Trustee and Administrator of the Plan, Cooke was undoubtedly aware of and responsible for the difference between the SPD and the Plan. Consequently, he cannot show now that he has suffered any prejudice from this discrepancy.

■ The court therefore concludes that, as a matter of law, Lynn Sand is entitled to a reversion of the residual assets of the Plan. However, there are disputed material facts as to the amount of lump-sum benefits paid or due to Cooke and other participants. *See* § IV. A., *supra.* The controversy over the amount of Cooke's benefits also affects the calculation of residual assets that may properly revert to Lynn Sand. Thus, summary judgment may not enter on the amount of Lynn Sand's reversion, if any, until the dispute over the interest rates has been resolved.

## E. *Procedural Violations of ERISA*

■ Cooke's complaint alleges that the Trustees committed various procedural violations of ERISA. Specifically, Cooke claims that the Trustees failed "to inform participants of the risks attendant to the alternative form of [lump-sum] distribution, that the election would not be given effect

unless the plan should close out under a Notice of Sufficiency issued by the PBGC, and that the PBGC does not guarantee benefits payable in the alternative form," all in violation of PBGC regulations. Complaint, ¶ 24. *See also id.* at ¶ 48.

Defendants have moved for summary judgment of this claim. Cooke did not object to defendants' motion for summary judgment on this issue. Nor did he argue that he was prejudiced by any of these alleged violations of PBGC regulations.

Based on these factors, the court finds that summary judgment should issue for defendants regarding Cooke's claim that the Trustees failed to comply with the disclosure requirements set forth in the PBGC regulations.

### F. *State Claims*

█ Cooke has raised state claims for breach of contract, breach of implied covenant of good faith and fair dealing, interference with advantageous relations and contract, misrepresentation, and unfair and deceptive practices under Mass.Gen.Laws c. 93A. Defendants have moved for summary judgment of these claims, arguing that they are preempted by § 514 of ERISA, 29 U.S.C. § 1144(a), and the regulations promulgated thereunder. *See Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 521–526, 101 S.Ct. 1895, 1905–08, 68 L.Ed.2d 402 (1981) (state laws are preempted by ERISA insofar as they are related to any employee benefit plan covered by ERISA). Cooke has not opposed defendants' motion for summary judgment on this issue.

Cooke's state claims appear to be preempted by ERISA. *Id.* In any case, since Cooke has not opposed defendants' motion on this issue, the court concludes that summary judgment should be granted for defendants on Cooke's state law claims.

### V. *Order*

For the foregoing reasons, the court hereby ORDERS that:

1. Summary judgment is DENIED on the question of the interest rates used to calculate Cooke's lump-sum benefit;

2. Summary judgment is GRANTED for defendants on Cooke's claim that the Trustees used the wrong starting date in calculating his lump-sum benefit;

3. Summary judgment is DENIED on Cooke's claim that the Trustees failed to pay him the proper amount of interest on his voluntary contributions;

4. As a matter of law, Lynn Sand is entitled to a reversion of the Plan's residual assets, but summary judgment is DENIED as to the amount of that reversion;

5. Summary judgment is GRANTED for defendants on Cooke's claims of procedural violations of ERISA; and

6. Summary judgment is GRANTED for defendants on Cooke's state claims.

The parties shall complete discovery concerning the remaining issues in this action within 90 days of the date of this order.