December 1, 1995
UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 94-2318

JAMES H. COOKE,

Plaintiff, Appellee,

v.

LYNN SAND & STONE COMPANY,
TRIMOUNT BITUMINOUS PRODUCTS COMPANY,
LOUIS E. GUYOTT, II, and STUART LAMB,

Defendants, Appellants.

 

ERRATA SHEET ERRATA SHEET

The opinion of this court issued November 27, 1995, should be

amended as follows:

On page 3, second paragraph, line 3: Change "PBGC specified" to

"PBGC-specified".

On page 5, second paragraph, line 4: Change " 22," to " 22,".

UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT



No. 94-2318

JAMES H. COOKE,

Plaintiff, Appellee,

v.

LYNN SAND & STONE COMPANY,

TRIMOUNT BITUMINOUS PRODUCTS COMPANY,

LOUIS E. GUYOTT, II, and STUART LAMB,

Defendants, Appellants.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge] 



Before

Boudin, Circuit Judge, 

Coffin, Senior Circuit Judge, 

and Stahl, Circuit Judge. 



Robert M. Gault with whom Alan S. Gale and Mintz, Levin, Cohn, 

Ferris, Glovsky and Popeo, P.C. were on briefs for appellants. 

Joseph F. Hardcastle with whom Ralph D. Gants and Palmer & Dodge 

were on brief for appellee. 



November 27, 1995



BOUDIN, Circuit Judge. This troublesome appeal involves 

a determination of benefits due following the termination of

a pension plan. On May 18, 1983, Trimount Bituminous

Products Co. ("Trimount") purchased Lynn Sand & Stone Co.

("Lynn"). At the time of the purchase, Lynn had in place an

employer-sponsored, defined-benefit pension plan. The plan

was subject to the Employee Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. 1001 et seq. 

At the time of the purchase, in May 1983, James Cooke

was president and treasurer of Lynn and also a trustee of the

plan. Shortly thereafter, Cooke was terminated as an officer

under circumstances not entirely to his credit, see Cooke v. 

Lynn Sand & Stone Co., 640 N.E.2d 786 (Mass. 1994), and later 

in the year Lynn replaced the trustees of the plan and voted

to terminate it. Article XIV of the plan permitted Lynn to

amend or terminate the plan at any time.

The proposed termination required a clearance by the

Pension Benefit Guaranty Corporation ("PBGC"), the federal

agency that insures ERISA-covered pension plans and regulates

terminations. See 29 U.S.C. 1341. When an employer 

voluntarily terminates a single-employer, defined-benefit

pension plan, all accrued benefits vest automatically, and

the employer must distribute benefits in accordance with

ERISA's allocation schedule. 29 U.S.C. 1344(a). Funds

left over may revert to the employer if the plan so

-2- -2-

specifies, 29 U.S.C. 1344(d), as the Lynn plan did. The

present litigation presents the question how much Cooke was

entitled to receive on termination of the plan.

In 1983 Cooke--who was then 53 years of age--had accrued

a monthly retirement benefit of $1,856.93, starting at age 65

and continuing for ten years or until his death, whichever

came first. The plan permitted the trustees to offer

beneficiaries an option, in lieu of monthly payments, of

receiving a lump sum distribution of equal value. Choosing

to offer this option to Cooke, the trustees had to determine

the present value of the promised monthly payments.

Mortality assumptions aside, this required selection of a

"discount" rate--effectively an assumed interest rate--to

compute a present lump sum equal to the stream of promised

future payments. See Robert Anthony & James Reece, 

Accounting Principles 199-203 (1983). 

The trustees retained an actuarial firm which advised

that, if the trustees chose to offer lump sum payments, the

appropriate choice of rates was between the PBGC-specified

interest rate of 9.5 percent1 or a somewhat higher interest

rate of 11 to 11.5 percent, reflecting the figure that

certain insurance companies would employ if Lynn purchased

 

1The 9.5 percent figure appeared in a PBGC schedule for
calculating lump-sum values of annuities as of a given plan
termination date. See 29 C.F.R. 2619, App. B (1986), 
setting forth a 9.5 percent rate for plans terminated between
September 1, 1983 and February 1, 1984. 

-3- -3-

annuities instead of providing lump sums. The higher the

rate selected, the smaller will be the lump sum needed to

equal the future stream of payments. Ultimately, the actuary

recommended the 9.5 percent figure, stating later that this

was the actuary's best judgment as to the proper rate as well

as the rate then commonly used on termination of a plan under

ERISA.

The use of the 9.5 percent figure equated to a lump sum

payment for Cooke of $58,987.98. Cooke's attorneys disputed

this computation, urging (based on certain language in the

plan yet to be described) that a 6 percent rate should be

used; on this premise, Cooke would have obtained a lump sum

of $96,892.42. The trustees maintained their position.

Ultimately, the PBGC issued a notice in September 1984,

finding that the assets of the plan would be sufficient to

cover all guaranteed benefits and rejecting without comment

Cooke's objections as to the rate selected.

On June 14, 1985, Cooke filed a complaint in the

district court, contending inter alia that the use of the 9.5 

percent interest rate violated the plan and therefore ERISA.

Cross-motions for summary judgment were filed, and the

district court issued an initial non-dispositive decision in

July 1986, relying in part on the trustees' interpretation of

the plan. See Cooke v. Lynn Sand & Stone Co., 673 F. Supp. 

14 (D. Mass 1986). Delay then ensued because the Supreme

-4- -4-

Court granted review in another case to determine the weight

to be given under ERISA to a trustee's interpretation of

disputed terms in a pension plan. Firestone Tire & Rubber 

Co. v. Bruch, 489 U.S. 101 (1989). 

After Firestone, the present case was eventually 

transferred to a different district judge. In the decision

now before us, the district court decided that under

Firestone the trustees' interpretation was entitled to no 

weight; and based on the court's own reading of the plan, the

court granted summary judgment in favor of Cooke. Cooke v. 

Lynn Sand & Stone Co., 875 F. Supp. 880 (D. Mass. 1994). 

Defendants in the district court--Lynn, Trimount and the plan

trustees (collectively "Lynn")--have now appealed, arguing

that their interpretation deserves weight and is in any event

correct. Cooke's main argument in favor of the 6

percent rate, adopted by the district court, was that this

rate was mandated by the plan and was not inconsistent with

PBGC regulations. The plan states in article I, 22, that

"[f]or purposes of establishing actuarial equivalence,

present value shall be determined by discounting all future

payments for interest and mortality on the basis specified in

the [plan's] Adoption Agreement." Section 1.09 of the plan's

adoption agreement, a boilerplate form with checked boxes and

inserted figures, provides that in establishing actuarial

-5- -5-

equivalence the figure of 6 percent should be used for

"[p]re-retirement interest."

In response, Lynn has argued that the 6 percent

provision applies where a lump sum is paid under the ongoing

plan but does not apply to termination payments. Lynn points

to article XIV, 2, of the plan, which states that in the

event of termination, the trustee must "allocate the [plan's]

assets" in accordance with 29 U.S.C. 1344. Section 1344

provides a mandatory priority schedule for plan payments on

termination. Incident to this and other sections of ERISA,

the PBGC has established regulations that address in some

detail the determination of the interest rate to be used in

lump sum computations when a plan is terminated.

The key regulation, 29 C.F.R. 2619.26, is concerned

with the valuing of a lump sum paid in lieu of normal monthly

retirement benefits where a plan's assets are sufficient to

cover all of its statutory obligations under section 1344.

The regulation requires the use of "reasonable actuarial

assumptions as to interest and mortality"; it directs the

plan administrator to specify the assumptions when seeking

termination clearance from the PBGC; it makes the assumptions

subject to PBGC review and to re-evaluation of benefits if

the assumptions are found unreasonable by the PBGC; and it

sets forth four "interest assumptions" that are "among those

that will normally be considered reasonable":

-6- -6-

(i) The rate by the plan for determining lump sum
amounts prior to the date of termination. This
rate may appear in the plan documents or may be
inferred from recent plan practice.
(ii) The rate used by the insurer in the
qualifying bid under which the plan administrator
will purchase annuities not being paid as a lump
sum. . . .
(iii) The interest rate used for the minimum
funding standard account pursuant to section 302 of
the Act and section 412(b) of the Internal Revenue
Code.
(iv) The PBGC interest rate for immediate
annuities in effect on the valuation date set forth
in Appendix B to this part.

Based on this language, Lynn argues that the plan

trustees were entitled to select any reasonable rate, that

the 9.5 percent PBGC rate actually adopted is one of the four

"normally . . . considered reasonable" under the regulation,

and that the evidence of the actuary hired by Lynn shows the

9.5 percent figure was certainly reasonable here. As to the

plan and adoption agreement, Lynn argues that the 6 percent

provision does not apply to terminations or, if intended to

apply, is overridden by the regulation.

We start with the regulation because, if so intended,

there is little doubt that it would override contrary plan

provisions. See 29 U.S.C. 1341(a); 29 C.F.R. 2619.3(a). 

Given the wording of the regulation and its likely purpose,

we agree that section 2619.26 would override any contractual

provision providing for a rate that proved to be

"unreasonable" under the regulation. But the reasonableness

-7- -7-

or unreasonableness of the 6 percent figure cannot readily be

determined on the present state of the record.

Although the district court deemed the 6 percent

interest rate reasonable, apparently because it was the rate

specified in the plan, the regulation does no more than make

the plan rate used prior to termination presumptively

reasonable. Further, it appears from the record that the 6

percent interest rate would generate a lump sum sufficient to

buy two annuities, each separately providing Cooke the 

promised monthly payments. Thus, it is at least open to

question whether the 6 percent figure is reasonable. The

record does show that the 9.5 percent figure is reasonable--

indeed, arguably generous to Cooke--but there can be more

than one reasonable rate.

If we assume arguendo that 6 percent is a reasonable 

rate and that the plan intended it to apply on termination, 

we see no reason why the plan could not require the trustees

to use that rate. It is true that the regulation might be

read to reserve the choice of a reasonable rate to the

trustees on termination, regardless of what the plan says.

But the regulation's language does not compel that reading,

and Lynn does not show that such a reading would serve any

purpose; after all, the PBGC can reject a plan-specified rate

if the PBGC finds the rate unreasonable. 

-8- -8-

We turn therefore to the contractual question whether

the plan should be read to require use of the 6 percent

figure not only in calculating lump sums paid during the life

of the plan but also lump sums paid upon termination. The

district judge who first dealt with the case deemed the

plan's language ambiguous on this issue, 673 F. Supp. at 22,

and we share that judgment. This led the same district

judge, as the law then stood before Firestone, to adopt 

Lynn's interpretation of the agreement as a "reasonable"

interpretation proffered by the plan trustees, subject to a

possible claim of bad faith. Id. 

This solution to plan ambiguities may be a sensible one,

especially because plan trustees typically (as here) retain

the power to alter plan provisions by express amendment. But

the Supreme Court in Firestone concluded that the trustees' 

reading of plan language may be given weight only if the plan

so provided in fairly explicit terms. Lynn does point to

some plan language marginally helpful to its position, but,

on balance, we agree with the district judge who took over

the case after Firestone that the plan language does not 

satisfy Firestone. See Rodriguez-Abreu v. Chase Manhattan 

Bank, N.A., 986 F.2d 580, 583-84 (1st Cir. 1983). 

Thus, in resolving the merits we give no weight to the

trustees' interpretation and review the plan language de novo 

and as presenting an issue of law, Rodriguez-Abreu, 986 F.2d 

-9- -9-

at 583, no one having suggested that there is any extrinsic

evidence that reveals the actual intent of the plan's

drafters. See Restatement (Second), Contracts 212(2) 

(1979). The difficulty is that the plan language can be

plausibly read either way. Nor is this surprising since in

all likelihood the plan drafters, in completing what were

largely boilerplate provisions, never had occasion to think

about the variation we confront in this case.

On the one hand, the plan specifies the 6 percent

figure, surely with ongoing plan operations in mind but

without specifically excluding a lump sum paid on termination

of the plan. On the other hand, termination is the subject

of a separate article; the article refers to a statutory

provision; and an associated regulation provides that those

terminating the plan shall select a reasonable rate. So far

as bare language goes, the choice between the Cooke and Lynn

readings is practically a coin flip; and the usual saws of

interpretation--such as "the specific controls the general"--

could be invoked by either side. 

Thus, another perspective must be sought. One might ask

how the plan drafters would have resolved the problem if they

had focused upon it, see Prudential Ins. Co. of America v. 

Gray Mfg. Co., 328 F.2d 438, 445 (2d Cir. 1964) (Friendly, 

J., concurring), or try to assign the burden of proof and

hold that the one having the burden has not carried it. See 

-10- -10-

United Steelworkers of America v. North Bend Terminal Co., 

752 F.2d 256, 261 (6th Cir. 1985). But both perspectives are

debatable in application and both have been opposed in

principle as well. See, e.g., Alan Farnsworth, Contracts  

7.16, at 547 (2d ed. 1990) (rejecting "hypothetical"

expectations); United Commercial Ins. Service, Inc. v. 

Paymaster Corp., 962 F.2d 853, 856 n.2 (9th Cir.), cert. 

denied, 113 S.Ct. 660 (1992) (disagreeing with United 

Steelworkers). 

We think that the proper solution in a case such as ours

should turn not on "hypothetical[s]" or "fictitious

intentions" but on "basic principles of justice that guide a

court in extrapolating from the situations for which the

parties provided to the one for which they did not."

Farnsworth, supra, 7.16, at 547-48. On this basis Lynn's 

interpretation is superior. Plan termination is a drastic

and unique event; and for that occasion the PBGC regulation

provides a detailed regime for selecting a reasonable

interest rate. A reading of the plan that leaves that

subject solely to the regulation is straightforward,

workable, and far less likely to result in a tension between

the plan and the regulation. 

Further, it is hard to see how substantial injustice can

be done to the beneficiary if the trustees are confined to

choosing a "reasonable rate." By contrast, insistence on a

-11- -11-

fixed rate can easily produce anomalies such as the alleged

double recovery that might be available to Cooke in this

case; and, as Lynn points out, it could easily be the

beneficiary who suffered from a very small lump sum payment

if the plan's contract rate happened to be too high.

Finally, letting the PBGC regulation govern increases the

likelihood that the trustees will afford a lump sum option to

the employee in the first place.2 

One might argue that any ambiguity in an ERISA plan

should be resolved in favor of the beneficiary. We take a

more agnostic view of the statute. Beneficiaries come first

on the priority list but only to the extent of the benefits

due them; and the statute expressly permits the employer to

reclaim the surplus, if the plan so permits (as it does

here). 29 U.S.C. 1344(d). Such plans should be read

fairly, but not automatically to maximize the award to the

beneficiary. Foltz v. U.S. News & World Report, Inc., 865 

F.2d 364, 373 (D.C. Cir.), cert. denied, 490 U.S. 1108 

(1989).

The problem encountered in this case ought not to recur

if plan administrators are vigilant. It could easily be

 

2Of course, a fixed figure might be desirable in the
context of an ongoing plan, simply for the sake of speed and
certainty; but in that context, there is no PBGC requirement
that the specified figure be reasonable and no potential for
conflict between the plan and the regulation where the plan
figure is arguably unreasonable.

-12- -12-

resolved under a plan that explicitly gave the trustees

authority to interpret in terms that meet Firestone's 

delegation requirement. Or, a plan could explicitly provide

that a specified interest rate is to be used upon 

termination, or--conversely--that the trustees on termination

may select any reasonable rate. Any plan that faces up to 

the problem can avoid the ambiguity encountered here.

We have considered whether there is a need for trial on

the question whether the trustees in this instance acted in

bad faith, as originally alleged by Cooke. The district

court did not find it necessary to pass on this issue which,

were a ruling on it subject to appeal, would be reviewed de 

novo. After examining the summary judgment filings, we think 

that Cooke's papers do not generate a trial-worthy issue on

the charge of bad faith. Accordingly, we conclude that the

grant of summary judgment in favor of Cooke must be set

aside, and that Lynn is entitled to summary judgment in its

favor.

The judgment is reversed and the case remanded with 

directions to enter summary judgment in favor of Lynn.

-13- -13-