**Roy E. DOOLEY, Jr., et. al.,**
**Plaintiffs-Appellants,**

**v.**

**AMERICAN AIRLINES, INC.,**
**Defendants-Appellees.**

**No. 85–1830.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 27, 1986.
Decided Aug. 5, 1986.

Russell Woody, Cotton Watt Jones & King, Chicago, Ill., for plaintiffs-appellants.

Russell M. Pelton, Peterson Ross Schloerb & Seidel, Chicago, Ill., for defendants-appellees.

Before WOOD, FLAUM and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The appellants, retired pilots of American Airlines, brought this four count complaint pursuant to the Employee Retirement Income Security Act (ERISA). They sought to enforce their rights under an American Airlines defined benefit pension plan. The district court, on cross-motions for summary judgment, held that the alleged ERISA violations were unfounded. Accordingly, the court entered judgment in favor of the appellees on all four counts. While we agree with the district court's disposition of Count I, we disagree with its disposition of Counts II through IV. Therefore, we affirm the district court's judgment in part, and we reverse that judg-ment in part and remand this case for further proceedings.

## I

This is an action brought under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a), to recover benefits and enforce rights under the terms of the American Airlines, Inc. Fixed Income Plan of the Pilot Retirement Income Program (Plan). The plaintiffs-appellants are fifty-eight retired pilot employees for American Airlines (Pilots). The defendants, all of whom are sued in their capacity as ERISA-defined fiduciaries, include 1) American Airlines, Inc., 2) the Plan, and 3) five individual members of American's Pension Benefits Administration Committee (collectively American).

The Plan is a "defined benefit pension plan" which provides that, upon retirement at age 60, a pilot employee is entitled to receive a Basic Retirement Annuity consisting of a monthly pension equal to 1.25% of the employee's final average compensation multiplied by a number equal to one less than the number of years of the employee's credited service. Reduced to its essentials, this means that an employee is entitled to receive a monthly annuity-like payment from the Plan. However, at the time of this litigation, a pilot employee was not *required* to receive his retirement in the usual annuity form. Instead, pilot employees were also entitled, pursuant to section 10.4 of the Plan, to select payment in one of a number of optional forms. This litigation focuses on the Plan's administration of only one of section 10.4's optional payment plans.

In this case, the Pilots chose to receive their retirement benefits in the form of a lump-sum payment. While that option was not specifically provided for in the actual plan document, payments in that form were nonetheless authorized by the document. Section 10.4(c) of the Plan provided:

(c) *Open Option.* A member may elect, if the Administrator consents thereto on the basis of policies uniformly applicable to all Members similarly situated, to re-

ceive his or her Basic Retirement Annuity ... in an optional form other than one specifically provided in this Section....

Appellants' Br. at 6. Pursuant to this section, American Airlines issued Bulletin No. 547–78 on October 26, 1978. That Bulletin provided that American Airlines:

and the Allied Pilots Association have agreed to allow lump-sum distributions at retirement from the Pilot Retirement Benefit Plan. This form of payment would be granted under the Open Option and is offered in addition to the various forms of payment currently provided under the Plan.

R.85, Ex. B. The Bulletin continued by explaining a number of preconditions to an employee's acceptance of payments under the lump-sum option. Furthermore, and more importantly for our purposes, the Bulletin also specifically stated that:

Distributions will be based on the annual benefit otherwise provided under the Plan multiplied by a lump-sum annuity factor. The factor is developed using an 8½% interest rate and the 1971 Group Annuity Mortality Table.

*Id.* Thus, at its inception, the lump-sum option had a stated 8½% fixed actuarial assumption. That assumption was used to discount to present value the total amount of payments that an employee would have otherwise received if he had selected the annuity option.

The fixed-rate actuarial assumption remained in effect for slightly more than one year. Then, on December 26, 1979, American Airlines issued Bulletin No. 497–79 which discontinued the fixed rate and, instead, adopted a floating actuarial assumption computed as 1% greater than the Moody's AAA Corporate Bond Rate for the second month preceding the employee's retirement date.[1] R. 85, Ex. D. According to the Bulletin, "[t]he purpose of this revision [was] to conform such interest rate to currently prevailing interest rates and to the Company's expectation for return on investment of pension assets for the intermediate term, that is, the term over which the series of payments would be made." *Id.* Shortly thereafter, this new policy was slightly modified. In Bulletin No. 161–80, issued on April 22, 1980, American Airlines 1) altered some of the preconditions for lump-sum payment, 2) changed the relevant Moody's AAA Corporate Bond Rate from the second to the third month preceding the employee's retirement, and 3) initiated a policy of "phasing in" the new floating rate by upwardly adjusting the 8½% fixed rate by 2% each month until it overtook the "Moody's + 1" rate. R. 85, Ex. E.

The dispute in this case centers on American Airlines' change in the actuarial assumption from the 8½% fixed rate to the "Moody's + 1" floating rate. According to the Pilots, between February 1981 and October 1982 the relevant Moody's rate ranged from a low of 12.12% to a high of 15.49%; therefore, the "Moody's + 1" rate peaked at a high of 16.49%. Appellants' Br. at 8. Because of this shift in interest rate, retirees during this period received a much smaller lump-sum payment than those individuals who retired while the 8½% fixed rate was still in effect. As a result, the Pilots brought this four count action in the district court. Count I asserts that American's change to the floating interest assumption constituted an amendment to the Plan which resulted in a reduction of accrued benefits in violation of ERISA § 204(g), 29 U.S.C. § 1054(g).[2] Count II asserts, in the alternative, that the floating interest rate was unreasonably high during the relevant time period and, therefore, resulted in lump-sum benefits which were less than actuarially equivalent to the normal retirement annuity. This deficiency, according to the appellants, cre-

---

1. This change came just ten months after the Internal Revenue Service issued Rev.Rul. 79–90, 1979–1 C.B. 156. That Ruling informed pension plans that their actuarial assumptions must be specified in the plan itself.

2. ERISA § 204(g), 29 U.S.C. § 1054(g), then provided:

The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) of this title.

ated a violation of the vesting provisions of ERISA § 203, 29 U.S.C. § 1053.[3] Count III is premised on the theory that 1) increases in the interest assumption lead to reductions in lump-sum benefits, and 2) reductions in lump-sum benefits lead to substantially smaller contributions to the Plan on the part of the employer, American Airlines. Given these linkages, Count III alleges that the change in the actuarial interest rate assumption was motivated by the Plan fiduciaries' desire to benefit economically American Airlines in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A),[4] which requires fiduciaries to discharge their duties solely in the interest of the Plan's participants and beneficiaries. Finally, Count IV seeks injunctive relief to prevent the continuation of the activities alleged in the previous three counts.

The district court, ruling on the Pilots' motion for summary judgment on Count I and American's cross-motion for summary judgment on Counts I through IV, found in favor of the defendants. The district court held that:

> The Plan in question specifically provides that any alternative form of payment must be "actuarially equivalent" to a retiree's Basic Retirement annuity. "Actuarially equivalent" is defined in the Plan as "the equivalent in value on the basis of actuarial factors approved from time to time by American Airlines."

\* \* \* \* \* \*

**3.** ERISA § 203, 29 U.S.C. § 1053, provides, in part:

> Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.
> (1) A plan satisfies the requirements of this paragraph if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.

**4.** ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), provides:

> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely

[Therefore, the] defendants' change in the discount interest rate did not constitute a "plan amendment" under ERISA and did not cause an unlawful reduction in plaintiffs' retirement benefits.

*Dooley v. American Airlines, Inc.*, No. 81 C 6770, slip op. at 5–6 (N.D.Ill. Apr. 17, 1985) [Available on WESTLAW, DCTU database] [hereinafter Order]. Relying on this basis, the district court found for the defendants on Count I. The court continued by stating:

> The Plan required that the lump sum payment be actuarially equivalent to the retirees' Basic Retirement annuity. The defendants' action served to insure actuarial equivalence. Accordingly, the defendants are not guilty of violating their fiduciary duties. Rather, I find that the defendants exercised good judgment in instituting the variable rate which will provide actuarial equivalence between available options.

*Id.* at 6. Based on these findings, the district court also found for American on Counts II and III. Additionally, since Count IV was derivative of the other three counts, and since the other three had been resolved in favor of American, the district court found in favor of American on Count IV. This appeal followed.

## II

### A. COUNT I

Count I deals with the alleged violation of ERISA § 204(g), 29 U.S.C. § 1054(g).[5]

> in the interest of the participants and beneficiaries and—
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan.

**5.** In 1984, section 204(g) was amended by adding the following language:

> For purposes of [the preceding] paragraph ..., a plan amendment which has the effect of—
> (A) eliminating or reducing an *early retirement benefit* or a retirement-type subsidy (as defined in regulations), or
> (B) eliminating an *optional* form of benefit,

That statute provides, in pertinent part, that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan...." Thus, the essential elements of a section 204(g) violation are: 1) a plan amendment, and 2) a reduction in accrued benefits. Since we agree with American that no plan amendment occurred in this case, we need not reach—and voice no opinion concerning—whether, if there were a plan amendment in this case, it would have served to reduce an employee's accrued benefits.

American contends that, assuming that the actuarial assumptions in this case can be construed as part of the employee benefit plan,[6] there was no ERISA § 204(g) violation because there was no plan amendment. To support this position, American first refers this court to the actual pension document. Section 10.4 of the plan—the section under which the lump-sum payment was authorized—stated: "Any optional form of Basic Retirement Annuity elected pursuant to this Section shall be the Actuarial Equivalent of an annuity payable for the lifetime of the Member only in an annual amount equal to such Basic Retirement Annuity...." Thus, section 10.4 can be fairly read as imposing a requirement that all optional forms of pension payments must be actuarially equivalent to the standard annuity form of payment. Additionally, Article II of the pension document (the article which defines the terms which will be used throughout the document) defines "actuarial equivalent" as "the equivalent in value on the basis of actuarial factors *approved from time to time by American Airlines....*" Article II, § (d) (emphasis

added). Therefore, by putting both of these provisions together, American contends that the pension plan administrators—by changing the actuarial assumption from the 8½% fixed rate to the "Moody's + 1" floating rate—were merely exercising a provision *which was already in the pension plan.* Accordingly, there could be no "plan amendment" because the administrators were merely carrying-out the provisions of the plan as it then stood.

■ American has supplied case law support for its position. In *Stewart v. National Shopmen Pension Fund,* 730 F.2d 1552 (D.C.Cir.1984), the District of Columbia Circuit discussed the appropriate meaning of "plan amendment." Dealing with ERISA §§ 203(c)(1)(B) and 204(g), the court noted that:

> In both sections, the word "amendment" is used as a word of limitation. Congress did *not* state that any change would trigger the two provisions; it stated that any change *by amendment* would do so. The district court found, and the plaintiffs admit, that there was no "amendment" to the plan in the "technical" sense—*i.e.,* an actual change in the provisions of the plan. True. All that happened was that § 2.09, a provision already incorporated into the plan, was *applied.* Actions authorized by the plan were carried out by the persons authorized to do so.

730 F.2d at 1561 (emphasis in original). In *Stewart,* the court was faced with a multiemployer pension fund. That pension fund specifically provided that if an employer's participation in the fund should terminate,

---

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy. The Secretary of the Treasury may by regulations provide that this subparagraph shall not apply to a plan amendment described in subparagraph (B) (other than a plan amendment having an effect described in subparagraph (A)).

29 U.S.C. § 1054(g) (emphasis added). This amendment became effective for plan years beginning after December 31, 1984—well after the relevant time period in this case. Therefore, the amendment has no direct relationship on the result of our case.

6. The parties have briefed and argued whether the actuarial assumptions—contained, as they were, in bulletins which were physically distinct from the pension plan document—can be construed as part of the pension plan for purposes of ERISA. Because of our disposition of this case, we need not reach that question.

the fund's trustees were empowered to cancel any portion of an employee's pension which was based on the employee's service with that particular employer prior to the time that the employer joined the multi-employer fund.[7] While the *Stewart* decision is factually distinguishable from the present case, its commonsensical rule of law is nonetheless applicable here. In the context of this particular pension plan, the plan fiduciaries had the authority to change the actuarial assumptions "from time to time" in an effort to maintain actuarial equivalence. That is precisely what they did in this case. Therefore, we are unwilling to contort the plain meaning of "amendment" so that it includes the valid exercise of a provision which was already firmly ensconced in the pension document.

In rebuttal, the Pilots argue that the Plan, by allowing this type of employer discretion in the setting of actuarial assumptions, was violative of ERISA. Therefore, they contend that we should disregard the Plan's discretionary provision as a matter of public policy. In this respect, the Pilots place their primary reliance on ERISA § 402(b)(4), 29 U.S.C. § 1102(b)(4), and Internal Revenue Code § 401 (IRC § 401), 26 U.S.C. § 401.

ERISA § 402(b)(4) provides that: "Every employee benefit plan shall—(4) specify the basis on which payments are made to and from the plan." Similarly, Treasury Regulation 1.401–1(b)(1)(i) requires that, for a plan to be qualified under IRC § 401, the plan must provide for "definitely determinable benefits." This latter requirement is met when the level of employee benefits is computed via a fixed formula and *"is not within the discretion of the employer."* See Rev.Rul. 74–385, 1974–2 C.B. 130. Accordingly, since IRC § 401's "definitely determinable benefits" requirement is, in some respects, parallel to the ERISA § 402(b)(4) requirement (plan must specify

the basis upon which payments are to be made), the Pilots would like to incorporate into ERISA, by analogy, the decisions under IRC § 401 which prohibit employer discretion in the establishment of employee benefit computational formulae.

Specifically, the Pilots would like to rely on Rev.Rul. 79–90, 1979–1 C.B. 156. That ruling, issued to explain the "definitely determinable benefits" requirement of Reg. 1.401–1(b)(1)(i), provides:

> Whenever the amount of a benefit in a defined benefit plan is to be determined by some procedure (such as "actuarial equivalent", "actuarial reserve", or "actuarial reduction") which requires the use of actuarial assumptions (interest, mortality, etc.) *the assumptions to be used must be specified within the plan in a manner which precludes employer discretion.*

(Emphasis added.) Therefore, to qualify as an IRC § 401 pension, a plan must eliminate employer discretion from the establishment of its actuarial assumptions. The Pilots would like us to impose this obligation on American Airlines. We decline the Pilots' invitation to take this step.

Since the IRS believed that Rev.Rul. 79–90 was a novel decision, the IRS devised a plan for phasing-in its effectiveness. For pension plans in existence on March 12, 1979 (the date of Rev.Rul. 79–90), the Ruling would first become effective for plan years beginning on or after December 31, 1983. For plans which were not in existence on March 12, 1979, the Ruling would become immediately effective. Finally, even if a plan's existence pre-dated March 12, 1979, if that plan already included its actuarial assumptions (i.e.: if the plan unwittingly complied with the revenue ruling) those assumptions could *not* be removed.

██ There can be no question either that the Plan was in existence on March 12,

---

7. Notably, such a provision is both contemplated by and specifically approved of in ERISA. *See* ERISA § 203(a)(3)(E), 29 U.S.C. § 1053(a)(3)(E). The *Stewart* court recognized this point when it stated: "To give trustees the flexibility necessary for efficient operation of

pension funds, Congress has recognized and provided for several situations in which plans can reduce or eliminate benefits to participants by implementing preexisting plan provisions." 730 F.2d at 1563 (footnote omitted).

1979 or that, on that date, the Plan was not in compliance with the employer discretion prohibitions contained in Revenue Ruling 79–90. Furthermore, there is no doubt that the IRS gave non-complying pension plans until December 31, 1983—well after the relevant time frame in this case—to come into compliance with its new ruling. Given this grace period, and given the fact that the IRS' section 401 treasury regulations and revenue rulings are neither incorporated into ERISA, *see* 29 U.S.C. § 1202(c), nor binding on us in this situation, *see Carle Foundation v. United States*, 611 F.2d 1192, 1195 (7th Cir.1979), we see no reason to immediately impose upon American a provision with which it was given years to comply.

Accordingly, we affirm the decision of the district court insofar as it granted summary judgment for the appellees with respect to Count I.

### B. COUNTS II THROUGH IV

■ Count II alleges that the new actuarial figure set by American Airlines (the "Moody's + 1" rate) did not, in fact, achieve actuarial equivalence and, therefore, violated ERISA § 203, 29 U.S.C. § 1053. Count III alleged that the pension plan's fiduciaries breached their duty by increasing the interest assumption in order that American Airlines (neither a plan participant nor a beneficiary) would be economically benefited. Both of these counts are closely related and both turn upon whether the plan fiduciaries appropriately set the new, floating-rate interest factor. In granting summary judgment in favor of the appellees on Counts II and III, the district judge apparently concluded that "[t]he defendants' action [in changing the interest assumption] served to insure actuarial equivalence." Order at 6. We believe that this factual finding was inappropriate given the summary judgment posture of this case.

Summary judgment may be granted only if the record indicates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judg-

ment as a matter of law." Fed.R.Civ.P. 56(c). As we stated in *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985) (citations omitted):

In reviewing a summary judgment, an appellate court must view the entire record and the inferences drawn therefrom in the light most favorable to the party opposing the motion. If a study of the record reveals that inferences contrary to those drawn by the trial court might be permissible, then the summary judgment should be reversed.

In this case, the appellants were able to raise a material issue of fact regarding the actuarial appropriateness of setting the interest assumption at the "Moody's + 1" rate. One of the appellants' experts, Mr. Carl H. Fischer, stated, as follows, in his affidavit:

*Actuarial Equivalence of Lump Sum Distributions.* In my professional opinion, actuarial equivalence must be determined on the basis of reasonable actuarial assumptions, consistently applied, including a reasonable interest assumption. Reasonableness implies a range and there is, therefore, no single interest rate which, alone, constitutes the reasonable interest assumption for purposes of actuarial equivalence. In my opinion, during the period from February, 1981, through September, 1982, during which most of the plaintiffs retired:

(a) 8½% was, and continued to be, well within the range of reasonable interest assumptions for purposes of determining the actuarial equivalence of lump sum distributions.

(b) The highest reasonable interest rate for purposes of determining actuarial equivalence of lump sum distributions was the rate promulgated by the Pension Benefit Guaranty Corporation for valuing immediate annuities, which rate, during the period in question, ranged from a low of 9¾% to a high of 11%.

(c) During a period of high volatility in market rates of interest, a variable interest rate, indexed to a standard intended to reflect current market rates of inter-

est, with no provision for eliminating the extremes of the fluctuations through averaging or some other technique, does not provide a reasonable interest assumption for purposes of determining the actuarial equivalence of lump sum distributions.

(d) A variable interest rate, one percentage point greater than the Moody's Aaa Corporate Bond Rate for the third month prior to retirement, was not, during the period in question, a reasonable basis for determining actuarial equivalence of lump sum distributions under the American [Airlines] Plan.

R. 106 at 33–34. In his deposition, Mr. Fischer also often repeated his belief that an interest assumption, in order that it accurately result in an actuarially equivalent amount in times of fluctuating interest rates, must incorporate some form of averaging which will moderate large, short-term changes in the current market interest rate. R. 117, Ex. W at 12, 13, 20, 21, 22. This testimony provided sufficient evidence, especially in light of the rather incomplete record on this point, to create a disputed issue of material fact. Accordingly, we reverse the district court's grant of summary judgment on Counts II and III, and we remand this case for further record development and proceedings. Additionally, since Count IV (seeking injunctive relief against the conduct which forms the basis for Counts I through III) is closely related to and, in part, derivative of Counts II and III, we reverse the grant of summary judgment on that count also and we remand it along with the other two counts.[8]

### III

In sum, we hold that summary judgment in favor of the appellees was appropriate with respect to Count I since there was no plan amendment. Accordingly, we affirm the district court's judgment with respect to Count I. However, with respect to Counts II through IV, we find that resolution of these three counts requires addition-

al findings on a disputed issue of material fact. Therefore, we reverse the district court's grant of summary judgment and we remand this case for further proceedings. Each party will bear its own costs of this appeal.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

---

8. We leave it to the district court to determine, in the first instance, whether any or all of the appellants' releases are valid and enforceable.