William L. WHITAKER, Jr., et al., Plaintiffs,

v.

TEXACO INC., et al., Defendants.

No. 1:83–CV–174–JTC.

United States District Court, N.D. Georgia, Atlanta Division.

Nov. 22, 1989.

Richard Lance Robbins, John A. Chandler, Sutherland, Asbill & Brennan, Atlanta, Ga., for plaintiffs.

Frank C. Jones, King & Spalding, Atlanta, Ga., J.M. Mitchell, James D. Garrison, Susannah B. Wilshire, Houston, Tex., for defendants.

## ORDER

CAMP, District Judge.

The above-styled action is before the court on defendants' motion for summary judgment on Counts I and II of plaintiffs' complaint. For the reasons stated below the court GRANTS defendants' motion as to both Counts.

## FACTS

All named individual plaintiffs in this action are former employees of Texaco Inc. who have retired and received pension plan benefits. All except James W. Davis represent two classes certified by the court pursuant to Fed.R.Civ.P. 23(b)(3). The first class was certified with regard to Count I of plaintiffs' complaint and consists of those salaried employees of Texaco who retired after January 31, 1981, and received a cash option payment in lieu of the normal form of retirement benefits provided under the Texaco pension plans. The second

class was certified with regard to Count II of plaintiffs' complaint and consists of those salaried employees of Texaco who retired after January 31, 1980, and likewise received a cash option payment in lieu of the normal form of retirement benefits.

Defendants consist of Texaco, The Group Pension Plan of Texaco Inc., The Retirement Plan of Texaco Inc., John C. Grant III, and R.G. Brinkman. Texaco Inc. is the sponsor of The Group Pension Plan of Texaco, Inc. and The Retirement Plan of Texaco, Inc. (referred to hereafter collectively as "the Plan"). The Plan provides pension benefits to retired Texaco employees. John C. Grant is currently the General Manager of Employee Relations of Texaco and has served as the Plan Administrator for the Plan since September of 1980. R.G. Brinkman is currently Senior Vice President and Chief Financial Officer of Texaco and served as Financial Manager of the Plan from June 1977 through August 1984.

The standard retirement benefit that the Plan offers is referred to as "normal retirement income" which is a straight life annuity providing equal monthly payments for the life of the retiree. The amount of those payments is unrelated to life expectancy, prevailing interest rates, or other actuarial factors—it is based on the employee's length of service and earnings. The Plan also offers certain optional forms of payment, including the cash option. Plaintiffs elected this option which is at issue in this case.

The Plan defines the cash option as follows:

(iv) Cash Option

Under Alternate Option (iv) (Cash Option) the Normal Retirement Income will be changed to a single sum amount which is the Actuarial Equivalent of the Normal Retirement Income payments, and this amount will be paid to the Member as a lump sum cash settlement on the designated Retirement Date. Election of this Option is subject to the approval of the Plan Administrator.

Pension Plan, Article XII, 2(c)(iv).

"Actuarial Equivalent" is defined as:

A benefit of equivalent value computed on the basis of the applicable actuarial tables and interest.

Pension Plan, Article 1.

When electing the cash option, the retiree receives the present value of what the retiree would have received under the normal retirement income. Under Texaco's plan the decision of what actuarial tables or discount rates to use was left to the discretion of the fiduciaries of the Plan.

The cash option was first added to the Pension Plan in 1962. At that time a discount rate of 4% was used. Defendants allege that from 1962 through 1974 only about 2% of Texaco's retiring employees elected the Cash Option. They attribute the lack of popularity to adverse federal income tax treatment. After Congress revised the tax code in 1974, retirees could rollover lump sum payments into Individual Retirement Accounts. Increased inflation and accompanying economic factors such as higher interest rates greatly increased the attractiveness of the cash option with only a 4% discount rate.

In 1975 the Plan fiduciaries reevaluated the 4% rate. They concluded that a person could easily receive the cash option, purchase an annuity, and receive fifteen to twenty-five per cent higher than the Plan otherwise provided as the normal retirement income. As a result, the cash option did not equal normal retirement income. Therefore, according to their calculations, the Plan itself was experiencing an equivalent actuarial loss every time someone chose the cash option, thus jeopardizing the Plan's viability. The Plan fiduciaries were also concerned that the Internal Revenue Service would consider the lump sum rate discriminatory, thus jeopardizing plan qualification.

An increase in the discount rate was recommended. Plaintiffs do not dispute that the reasons listed in the preceding paragraph were the reasons *cited* for the increase. In short, their complaint is that even if the reasons given for the increase were true, the increase was still prohibited because: 1) the increase constituted an illegal amendment of the Plan; and 2) the

fiduciaries were motivated by Texaco's interests and not the interests of the beneficiaries, constituting a breach of fiduciary duty.

Plaintiffs allege that the real reason for the increase was to lower the cost of the Plan to Texaco and to discourage mid-level employees from electing the option. By raising the discount rate and creating a "Supplemental Plan" for key executives [1], fewer mid-level employees would elect the option. Moreover they contend that if an increase was to be legal it should not have been applied "retroactively", depriving the retiree of the benefit of service years during which the rate was only 4%.

Plaintiffs have presented evidence that actuarial conditions were ignored in the past because Texaco wanted to maintain a competitive edge over competitor oil companies. They argue that because Texaco had not considered actuarial conditions prior to 1975—for the beneficiaries' advantage; they should not have been allowed to consider them in 1975—to the beneficiaries detriment. Also, plaintiffs dispute whether notice of the change was appropriate.

It cannot be overemphasized that the changes in the actuarial calculation did not affect *in any way* an employee's normal monthly pension at retirement, should an employee have chosen that form of retirement income. In other words, regardless of the effect of the new calculation on the cash option, the normal retirement income available to retirees remained the same. Plaintiffs concede this critically important fact. They recognize that the discount rate and mortality tables utilized by defendants

were reasonable and appropriate—since the discount rate did in fact represent the actuarial equivalent of normal retirement income.[2]

## LEGAL DISCUSSION

Plaintiffs do not argue that defendants could never increase the discount rate to reflect current economic conditions. Plaintiffs argue only that under the terms of the Plan defendants could not apply any increase to the 4% rate *retroactively* to reduce lump sum benefits. In other words plaintiffs maintain that if a Texaco employee begins work on December 31, 1969 when the discount rate is at 4%, that employee should be entitled to the 4% rate upon retirement, even if on January 1, 1970 the rate is increased to 8%. Additionally, plaintiffs contend that defendants could not direct increases for improper reasons, regardless of whether the increase may have been facially reasonable under the Plan.

■ This court will first address the appropriate standard of review for this action. The recent Supreme Court case *Firestone Tire and Rubber Co. v. Bruch,* —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), is controlling on this point. In *Firestone* the plan participants were denied severance benefits. The dispute centered around whether there had been a "reduction in work force", pursuant to the subject plan, entitling the participants to the severance benefits. The court held that a denial of benefits is to be reviewed under the *de novo* standard unless the benefit plan gives the administrator discretionary authority to

1. The Supplemental Pension Benefits Plan was a separate Plan that was created for high level executives. Defendants maintain its creation was necessary to maintain a competitive edge over rival oil companies. Plaintiffs allege it was defendants' way of keeping certain key individuals at Texaco without having to keep the discount rate at four percent for all employees.

2. The Court: Do you all agree, though, that the discount rates [the trustees] chose are appropriate discount rates ... at the date they were adopted? There is no dispute about that?

    Mr. Robbins [attorney for plaintiffs]: I would say we are not saying that the discount rates—

The Court: I'm not talking about appropriate for purposes of determining your lump sum benefit. I just mean a correct discount amount.

    Mr. Robbins: We are not saying that the discount rates, if employed as they should have been and if made, if the actions were made in accordance with the Plan, were too high or—

    The Court: Or the actuarial tables that were adopted by the Plaintiffs[?]

    Mr. Robbins: We are not attacking the tables as too high.

    The Court: There is no dispute about that[?]

    Mr. Robbins: We are not, we are certainly not raising a dispute about that.

(Transcript of Summary Judgment Hearing on October 19, 1988, pp. 44–45.)

determine eligibility for benefits or to construe the terms of the plan. In such case the appropriate standard is "arbitrary and capricious". *Id.* 109 S.Ct. at 956.

Several Circuit courts have already applied *Firestone.* In a recent Eleventh Circuit case, *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37 (11th Cir. 1989), the court used the "arbitrary and capricious" standard because the subject plan conferred upon the trustees "full and exclusive authority to determine all questions of coverage and eligibility ... [and] full power to construe the provisions of the Trust". 877 F.2d at 39. In *Boyd v. Trustees of the United Mine Workers Health & Retirement Funds,* 873 F.2d 57 (4th Cir. 1989), the court applied the arbitrary and capricious standard because the trustees had power of "full and final determination as to *all issues* concerning eligibility for benefits" and were authorized to "promulgate rules and regulations to implement th[e] plan". 873 F.2d at 59 (emphasis added). In *Lowry v. Bankers Life and Casualty Retirement Plan,* 871 F.2d 522 (5th Cir.1989), the court applied the arbitrary and capricious standard because the trustees were granted "permissive authority to 'interpret and construe' the ... Plan and the power to 'determine all questions of eligibility and status under the Plan' ".

The Plan in the instant case does not give the administrator authority to construe the provisions of the trust as the plans did in the above cases.[3] The administrator does have the authority to "determine benefit eligibility". However, there is a noted absence of the broad, discretionary and permissive language that is seen in the plans at issue in *Guy, Boyd* and *Lowry.* Additionally, this court recognizes that as yet the case law is not well-settled as to how much discretion is necessary to trigger the arbitrary and capricious standard under *Firestone.* Therefore, in the interests of caution and judicial economy, this court will

make its determination pursuant to the *de novo* standard, *see Questech, Inc. v. Hartford Accident & Indemnity Co.,* 713 F.Supp. 956 (E.D.Va.1989) (Court uses *de novo* standard "in the interests of judicial economy." 713 at 957, n. 3).

## I.  COUNT I

Count 1 of plaintiffs' complaint alleges that defendants breached the terms of the Plan constituting a violation of 29 U.S.C. § 1132(a)(1)(B). First, they allege that the increase in the discount rate was, in effect, an "amendment" which reduced the amount of "accrued benefits" due plaintiffs. Under the terms of the Plan, defendants' cannot make an amendment to the Plan resulting in a reduction of "accrued benefits" without obtaining the approval of plan members. Therefore, this court must make a determination of: 1) whether defendants' actions constituted an "amendment"; and 2) whether the discount rate of 4% was an "accrued benefit".

### a.  Was there an "amendment" to the Plan?

[2] Plaintiffs do not argue that defendants could never increase the discount rate to reflect current economic conditions. Plaintiffs argue only that under the terms of the Plan, *as consistently interpreted and implemented,* defendants could not apply the rate retroactively.

29 U.S.C. § 1054 states quite simply that the "accrued benefit of a participant under a plan may not be decreased by an amendment of the plan". Defendants argue that the increase in the discount rate which reduced the lump sum benefits plaintiffs received did not constitute an "amendment" pursuant to 29 U.S.C. § 1054(g) because lump sum benefits are not "accrued benefits" *as defined by the Employee Retirement Income Security Act* (hereafter "ERISA").[4] However, whether defen-

---

3. The Plan administrator does have discretionary authority to interpret some provisions. For example the administrator has discretion when interpreting the term "actuarial equivalent". However, that term is not the only term relevant to this action.

4. Congress amended § 1054(g) in 1984 to include protection of alternate forms of benefits such as the cash option. However, the amendment was prospective in nature and thus does not apply to this lawsuit. *Bencivenga v. Western*

dants' actions constituted an "amendment" pursuant to § 1054(g) is irrelevant. Plaintiffs are suing under 29 U.S.C. § 1132(a)(1)(B) which prohibits employers from violating *the terms of their own plan.* Plaintiffs insist correctly that ERISA was intended to be a "floor" and not a "ceiling" and thus a Plan can give more rights than ERISA requires under § 1054(g). Under § 1132 those additional rights can be enforced.

Pursuant to § 1132(a)(1)(B) a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan". The Plan involved in this action provides that it may not be modified, suspended, or amended in a manner which will reduce the amount of retirement income or other benefits accrued to any member:

> The Company, in its sole and absolute discretion, reserves the right, at any time and from time to time, to suspend or discontinue its contributions or to modify, suspend, amend or terminate this Plan in whole or in part (including provisions relating to contributions), provided, however, that the Company shall have no power to perform any of such actions in a manner which will ... reduce the amount of retirement income or other benefits theretofore accrued to any Member, Retired Member, Dependent Member or Beneficiary of any deceased Member.

Pension Plan, Article XIV(1).

Thus to prove a violation of Article XIV(1), plaintiffs must show that defendants enacted an amendment or modification resulting in a reduction of an accrued benefit. The case law, as seen in *Dooley v. American Airlines,* No. 81 C770, slip op., 1985 WL 768 (N.D.Ill. April 17, 1985), *affirmed in part, reversed in part,* 797 F.2d 1447 (7th Cir.1986); *Lewis v. Fulton Feder-*

al *Savings and Loan Association Pension Retirement Plan,* No. 82–736A, slip op. (N.D.Ga. August 31, 1978), *appeal dismissed;* and *Grand Union and Independent Transportation Employees Association,* 82–2 ARB, ¶ 8432 (June 2, 1982), demonstrates that the adjustment of the discount rate does not constitute an amendment per se. Plaintiffs maintain that the latter cases are distinguishable from their case.

In *Dooley* the subject plan defined "actuarial equivalent" as "the equivalent in value [to normal retirement income] on the basis of actuarial factors approved from *time to time* by American Airlines". Slip op. at 5. (emphasis supplied in Defendants' Response to Plaintiffs' Motion for Summary Judgment, p. 26). In *Lewis* "actuarial equivalent" is defined as the most recent discount rate. Slip op. at 3. In the instant case "actuarial equivalent" is defined as "a benefit of equivalent value computed on the basis of the applicable actuarial tables and interest". Plaintiffs would have this court distinguish *Dooley* and *Lewis* from the instant case because the definition of "actuarial equivalent" is different. Plaintiffs argue that in *Dooley* and *Lewis* it is implicit in the definition that the discount rate will be regularly changed, whereas in the instant Plan that is not the case. As evidence of their assertion, plaintiffs point out that the discount rate was not changed for fourteen years (although it was changed several times since that initial change).

Plaintiffs' narrow reading of *Dooley* and *Lewis* is both unappealing and impractical. Plaintiffs' assertion seems inconsistent with their admission that the Plan does not prohibit defendants from ever increasing the discount rate to reflect current economic conditions. (*See* Plaintiffs' Response to Defendants' Motion for Summary Judgment, Nov. 2, 1987, p. 9).[5] It is obvious

---

*Pa. Teamsters & Employers Pension Fund,* 763 F.2d 574, 577 n. 3 (3rd Cir.1985).

**5.** Recall that plaintiffs have expressly acknowledged to this court that the discount rates and

mortality tables utilized by defendants were reasonable and appropriate. Transcript of Summary Judgment Hearing, October 19, 1988.

from a plain reading of the Plan that a change in the discount rate is permitted.

This court holds that *Dooley* and *Lewis* do apply to this case. The facts are almost identical. The plaintiffs in *Dooley* were retired American Airlines' pilots, who elected a lump sum option rather than monthly annuity payments. The retirees attempted to argue that American's decision to increase the discount rate constituted an amendment to their pension plan which effectuated a reduction of accrued benefits. The court rejected the plaintiffs' argument, finding that defendants had merely exercised a provision contained in the pension plan itself: "we are unwilling to contort the plain meaning of 'amendment' so that it includes the valid exercise of a provision which was already firmly ensconced in the pension document" *Id.* at 1452.

In *Lewis* the court pointed out that the discretionary power of the fiduciaries to determine the actuarial equivalent demonstrated that no actuarial factor was specified in the plan. *Id.* at 24. If an actuarial factor was *specified* in the plan, and that *actuarial factor* was changed, *then there would have been an amendment of a provision. Korn v. Levine Brothers Iron Works Corporation,* 574 F.Supp. 836 (S.D. N.Y.1983). However, if the *provision itself* gives the fiduciary discretion, then exercising that discretion is obviously not an amendment of a provision, it is simply the exercise of a provision. In sum, Article XI of the Plan expressly vests the administrator with the authority to adopt actuarial tables and discount rates. Therefore, when he adopted different actuarial tables and a different discount rate, he was simply exercising a provision of the Plan.

Finally, although plaintiffs are generally correct in stating that 29 U.S.C. § 1054 is inapposite, this court, like the court in *Dooley,* believes that it is useful in a determination of what "amendment" means for purposes of this lawsuit ("it is a commonsensical rule of law applicable [in a § 1132 case]." 797 F.2d at 1452). *Dooley,* a § 1132 action, cited to *Stewart v. National Shopmen Pension Fund,* 730 F.2d 1552 (D.C.Cir.1984), a § 1054 action. In *Stewart*

the court stated that when § 1054 refers to "amendment" it does not mean *any* amendment, it means amendment of *the plan. Id.* at 1561 (emphasis added). Applying that analysis to the instant case, it is evident that there *was an* amendment in the strict sense of the word. However, there was no amendment of *the Plan.* Section 1132 deals exclusively with amendments to *plans.*

b. *Were plaintiffs deprived of "accrued benefits"?*

■ Plaintiffs also allege that there was a reduction in accrued benefits. The relevant statute is clear that an accrued benefit is "expressed in the form of *an annual benefit* commencing at normal retirement age". 29 U.S.C. § 1002(23) (emphasis added). An accrued benefit is an annuity or an annual payment—not a discount rate used to calculate the amount of a cash option. Therefore, the proper amount of a cash option is equal to that amount which an employee would have received from annuities, discounted to present value.

The case law follows the plain wording of the statute. In *Bencivenga v. Western Pennsylvania Teamsters and Employees Pension Fund,* 763 F.2d 574 (3d Cir.1985), a retired employee challenged the discount rates used to calculate his early retirement payments. The court held that accrued benefits were calculated by using the normal annuity amount, not varying discount rates used in optional payments. Likewise, in *Sutton v. Weirton Steel Division of National Steel Corporation,* 724 F.2d 406 (4th Cir.1984), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984), the court held that the term "accrued benefit" encompassed only annuity payments commencing at normal retirement age and did not include optional payments such as early retirement or severance payments. *See also Fentron Industries, Inc. v. National Shopmen Pension Fund,* 674 F.2d 1300, 1306 (9th Cir.1982).

Plaintiffs' argument is contrary to a common sense interpretation of the language. A cash option which is the actuarial equivalent of normal retirement income is just

what it says. If raising the discount rate to reflect the proper present value of normal retirement income is denying an accrued benefit, the result would be that everyone choosing the cash option at the artificially low discount rate would be receiving a windfall compared to all beneficiaries who chose normal retirement income. *Plaintiffs are entitled only to an amount equivalent to normal retirement income.* The only amount which is "accrued" is that which represents normal retirement income. The Plan speaks for itself. Nowhere does it say that a beneficiary is entitled to a certain discount rate. Plaintiffs themselves admit that at the time the discount rate was changed ERISA imposed no obligation on defendants to even maintain *any* cash option. (See Plaintiffs' Supplemental Brief, July 5, 1989 p. 6) Nor have plaintiffs demonstrated that such an obligation is imposed on defendants pursuant to the Plan.

Plaintiffs allege that, though defendants were not prohibited from changing the discount rate, they were prohibited from applying it retroactively. Again this is contrary to common sense. A cash option which is the actuarial equivalent of normal retirement income *is by its very nature prospective.* If discount rates were not applied prospectively then they would never reflect the actuarial equivalent of normal retirement income. The recipient would always take either a windfall or a loss depending on inflation and whether the discount rate was lowered or raised during the service years of the recipient. In sum, applying a different discount rate is not a "retroactive" change to the Plan.

c. *Was there an "amendment" to the Plan, and likewise "accrued benefits", because of the way the Plan was interpreted and implemented by the Plan fiduciaries?*

■ Plaintiffs argue that defendants are bound by pre–1975 policy decisions which kept the discount rate at 4% despite changing actuarial conditions. As evidence, they point to numerous times where defendants decided to *temporarily* keep the discount rate at 4% for the benefit of retiring employees, thereby maintaining a competitive rate over rival oil companies. They insist that these actions created "certain expectations which [Texaco] should not be free to ignore later". (Plaintiffs' Response to Defendants' Motion for Summary Judgment, Nov. 2, 1987, p. 20). To use their words, plaintiffs contend that defendants were "holding out a carrot" to induce the employees to stay. *Id.* p. 21.

Plaintiffs' position would require this court to go outside the express terms of the Plan and venture into common law doctrines such as estoppel. The case law is clear in this circuit that oral modifications and common law estoppel are not applicable in ERISA analysis. *Nachwalter v. Christie,* 805 F.2d 956, 959 (11th Cir.1986); *Phillips v. Amoco Oil,* 799 F.2d 1464, 1470 (11th Cir.1986). In *Nachwalter* the court rejected the plaintiffs' position that "estoppel can be used to override a written ERISA plan." *Id.* at n. 4. The written terms of the instant plan state that under the cash option the retiree is entitled to the "Actuarial Equivalent of the Normal Retirement Income payments … subject to the approval of the Plan Administrator". Pension Plan Article VII 2(c)(iv). The Plan administrator has the discretion and authority to employ "such actuarial and consulting services" for the "adoption of such actuarial tables as it may deem advisable in connection with the administration of the Plan". Pension Plan Article XV 2(a)(ii). This court will not go outside of the written terms of the Plan.

Even if an estoppel argument was available, there is no evidence in the record that any plaintiff was ever led to believe that the discount rate would be kept at 4%. In fact the contrary is true. Plaintiffs were in possession of the Plan which specifically states that the cash option was calculated by using actuarial tables. Plaintiffs have provided evidence that demonstrates that defendants were aware that keeping the discount rate at four per cent would benefit employees electing the cash option and that keeping it at that rate would involve an additional cost to Texaco. Plaintiffs have also shown that there were times when

defendants considered raising the discount rate but decided against such action. However nothing in the record suggests that defendants were agreeing to keep the rate at 4% *permanently* or that they were trying to induce employees to stay with Texaco under the impression that when they retired they would receive the lower rate. The evidence submitted by plaintiffs merely demonstrates a desire on the part of defendants to keep the discount rate at 4% for employees *presently* retiring.

Additionally, plaintiffs' assertion that defendants were "holding out a carrot" to Texaco employees is in conflict with plaintiffs' later argument that defendants failed to communicate the terms by which the cash option was calculated.[6]

Considering the historic vagaries of the rate of inflation, the guarantee of such a low discount rate could threaten the Plan's viability. Plaintiffs have produced no evidence that defendants ever intended to take such an imprudent course of action. Moreover, ERISA was not intended to guarantee beneficiaries favorable discount rates. *Bencivenga v. Western Pa. Teamsters and Employers Pension Fund, supra,* is particularly relevant to this issue. In *Bencivenga,* a retired employee challenged the discount rates used to calculate his optional early retirement benefits under the Teamsters pension plan. Just as in this case, in the years prior to plaintiffs' retirement, those discount rates were increased periodically to maintain actuarial equivalence between benefits paid to those retiring at normal retirement age and those paid to employees electing early retirement. The plaintiff complained that the defendants' adjustments in the discount rate reduced his accrued benefits in violation of ERISA. The court held that there were no accrued benefits involved and affirmed summary judgment against the plaintiff. They concluded that ERISA *"was not intended to assure the sanctity of early retirement expectations".* 763 F.2d at 577. Similarly in this case, just because some of plaintiffs were working at

a time where they *might have* obtained the cash option at 4%, does not make the four percent rate an accrued benefit protected by ERISA.

## II. COUNT II

▆ Plaintiffs also allege that defendants violated their fiduciary duties to plaintiffs pursuant to 29 U.S.C. §§ 1104, 1105 and 1109. In so doing plaintiffs contend that even if the adjustment in the discount rate was a reasonable interpretation of the Plan, defendants did so for improper reasons. Plaintiffs allege that though defendants *claimed* they changed the discount rate because of fluctuating actuarial conditions, the *real reason* was because it was financially beneficial to Texaco.

Section 1104(a)(1) reads as follows:

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

. . . .

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

Of critical importance in this court's analysis is the amount of discretion, if any, that was exercised by the trustees in the instant action. It is an elementary princi-

**6.** Plaintiffs allege in Count II that defendants breached their fiduciary duties in violation of 29 U.S.C. § 1104. One of their arguments in

support of that claim is that defendants intentionally concealed information relating to the calculation of the cash option.

ple of trust law that a fiduciary analysis only applies to situations where a trustee has discretion. "The exercise of a power is discretionary except to the extent to which its exercise is required by the terms of the trust or by the principles of law applicable to the duties of trustees." RESTATEMENT (SECOND) OF TRUSTS § 187. As set out in ERISA:

> a person is a fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of the plan.

29 U.S.C. § 1002(21)(A) (emphasis added). A trustee is not a fiduciary with respect to matters in which he has no discretion. Therefore, if a trustee's challenged action is merely ministerial in nature, *e.g.,* required by the terms of the trust, the court will simply look to the terms of the trust to determine whether the actions were acceptable. In other words, rather than invoking a fiduciary analysis, the court will invoke a contractual analysis.

This court must determine whether the trustees had discretion with respect to the decision they made. The Plan requires that the trustees choose a discount rate that represents the actuarial equivalent of normal retirement income. The trustees have no discretion to choose a discount rate that does not represent the actuarial equivalent of normal retirement income. Thus they are not a fiduciary with respect to that decision and a fiduciary analysis as to that decision would be improper. However, the trustees do have the limited discretion of *what actuarial figure to use.* In other words, they have the discretion to choose between two different, but reason-ably accurate discount rates. With respect to that decision, a fiduciary analysis is proper.

A fiduciary analysis is not appropriate in this cause of action. Plaintiffs are challenging the trustees' decision to use a figure that represented the actuarial equivalent of normal retirement income. They are seeking a more favorable rate which does not represent the actuarial equivalent of normal retirement income. Plaintiffs *do not dispute* that the discount rates chosen by the trustees represent the actuarial equivalent of normal retirement income. If they did, pursuant to a reasonable interpretation of the Plan, then a fiduciary analysis would be appropriate; however, that is not the case at hand.

As mentioned, in 1975 the trustees decided to raise the discount rate from 4% to 5.25%. Subsequently the rate was periodically raised and lowered depending on actuarial conditions, reaching a peak of 11% in 1982. Plaintiffs argue that they are entitled to the 4% rate despite the fact that that rate clearly does not represent the actuarial equivalent of normal retirement income. Thus plaintiffs themselves have lifted this action out of a fiduciary analysis. This court must therefore undergo a contractual analysis to determine whether the trustees may, pursuant to the express terms of the Plan, choose a figure that does not represent the actuarial equivalent of normal retirement income.

As mentioned, the Plan defines "Cash Option" as a "single sum amount which is the Actuarial Equivalent of the Normal Retirement Income payments".[7] The Plan defines "Actuarial Equivalent" as "a benefit of equivalent value computed on the basis of the applicable actuarial tables and interest".[8] The Plan does not give the trustees the discretion to use a discount rate of 4%. There is no question of fact as to that issue. Therefore summary judgment is appropriate.

A district court in *Cooke v. Lynn Sand & Stone Co.,* 673 F.Supp. 14 (D.Ma.1986), reached the same result on very similar

---

7. Pension Plan, Article XII(2)(c)(ii).

8. Pension Plan, Article 1.

facts. In *Cooke* the plaintiffs alleged that two decisions of the trustees amounted to a breach of fiduciary duty in violation of 29 U.S.C. § 1104. The first was the trustees' decision to use a 9.5% discount rate rather than a more favorable rate in a situation in which the subject plan *offered them discretion*. The second was the starting date for benefit calculations. With regard to the decision to use the 9.5% interest rate, the court expressly held that the trustees had acted pursuant to a reasonable interpretation of the plan. However the court also held that the plaintiffs' construction of the plan was reasonable. 673 F.Supp. at 22. The court denied the trustees' motion for summary judgment on that issue because the trustees *had the discretion* to construe the Plan in favor of the plaintiffs. With regard to the decision relating to the starting date for benefit calculations, the court granted the trustees motion for summary judgment, because it found that the trustees *had no such discretion*, that is, the Plan prohibited the starting date being requested by the plaintiffs:

> With respect to the interest rate issue, Cooke raised material disputed facts concerning the Trustees motive for choosing the 9.5% rate *in a situation in which ambiguity within the Plan offered them discretion*. With regard to the starting date for calculations, Cooke has not alleged any facts that could support a finding that the Trustees acted in bad faith or breached their fiduciary duty by using the 1964 starting date. *The clear language of the Plan did not allow the Trustees to choose an earlier date.*

*Id.* at 26. (emphasis added). The clear language of the Plan in the instant case did not allow the trustees to choose a 4% discount rate. Unlike *Cooke*, plaintiffs' interpretation of the Plan is unreasonable. Plaintiffs' request for the 4% discount rate is similar to the *Cooke* plaintiffs' request for an earlier starting date for benefit calculations.

This same analysis is used in a Seventh Circuit case *Van Boxel v. Journal Company Employees' Pension Trust*, 836 F.2d 1048 (7th Cir.1987). In *Van Boxel*,[9] the plaintiff challenged the denial of a pension claim by the pension's trustees. Judge Posner recognized that there may have been some evidence of conflict of interest and improper motive on the part of the trustees in making their decision. 836 F.2d at 1048. However, he held that the court did not have to delve into that issue because the trustees did the only thing they could have under the Plan—that is, they denied the plaintiff's claim to a pension. The court recognized that if the trustees had interpreted the Plan the way the plaintiff wanted them to, they would have contravened the express terms of the Plan. Therefore, the court held that the conflicts of interest issue was irrelevant and refused to subject the trustees' actions to a fiduciary analysis.

Like the plaintiffs in *Van Boxel*, the plaintiffs in this case have presented evidence that the trustees may have acted pursuant to an improper motive when they raised the discount rate. However, like the court in *Van Boxel*, this court holds that such evidence of improper motive is irrelevant because the trustees did the only thing they could have under the Plan—they chose a discount rate that represented the actuarial equivalent of normal retirement income. *Plaintiffs have expressly represented to this court that they do not dispute that the discount rate defendants used represented the actuarial equivalent of plaintiffs' retirement income.* In effect, plaintiffs are alleging that defendants breached their fiduciary duty to plaintiffs for refusing to go outside the express written terms of the Plan. Defendants have done exactly what the Plan required and would be prohibited by the Plan from doing

---

**9.** *Van Boxel*, like *Firestone supra*, is a § 1132 case. Nevertheless both cases are entirely relevant to § 1104 actions. The analysis is the same. The court will initially use the "prudent man" or "arbitrary and capricious" standard. However, if their is evidence of improper motive or conflict of interest, the court will scrutinize the trustee's actions to determine whether, had it not been for the improper motive or conflict of interest, the trustee would have acted otherwise.

what plaintiffs are requesting. As mentioned in this court's discussion in Count I, ERISA and the case law interpreting ERISA, prohibits this court from going outside the express terms of the Plan in reaching its decision. Defendants simply do not have the discretion that the plaintiffs claim they do; therefore, the improper motive and conflicts of interest issues are irrelevant.

The cases the plaintiffs cite as authority are not inconsistent with the instant holding. In *Dooley v. American Airlines supra*, the plaintiff presented evidence that the interest rate may not have represented the actuarial equivalent of normal retirement income. The trustees had the discretion to have opted for a different, more favorable rate. In the instant case the plaintiffs do not dispute that the discount rate represents the actuarial equivalent. In *Deak v. Masters, Mates and Pilots Pension Plan*, 821 F.2d 572 (11th Cir.1987), *Amato v. Western Union International, Inc.*, 773 F.2d 1402 (2d Cir.1985), and *Wilson v. Allegheny International, Inc.* Slip Op. No. 83 C 9254, there were amendments to the respective plans, all of which were facially reasonable pursuant to the written terms of the plans. The trustees had the discretion to make or not make the amendments. Moreover it was clear that a prerequisite to the cause of action was that the plaintiffs' position must be reasonable under the terms of the plan.

The fact that plaintiffs have offered some evidence that in the 1960's the Plan administrator used a discount rate that represented less then the actuarial equivalent is irrelevant. Once again, this court cannot go outside the express terms of the Plan in making its decision. The Plan requires that the actuarial equivalent be used. If the administrator did have discretion to use a discount rate less than the actuarial equivalent, the conflicts of interest would be relevant; but because the administrator clearly did not, this court need not consider that issue. It is worthy of note that if the Plan administrator ignored the actuarial conditions and continued to use the 4% discount rate, other beneficiaries could very well have had a cause of action

against him for disregarding the express terms of the Plan and threatening the actuarial soundness of the Plan. *See Cefalu v. B.F. Goodrich Company*, 871 F.2d 1290, 1296 (5th Cir.1989) ("Employees who rely on a written benefit plan should not have their benefits eroded by oral modifications to the benefit plan. Furthermore, the writing requirement protects the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to such under the express terms of the Plan.")

In sum, it is evident that the trustees in this action: 1) had no discretion to choose a discount rate that did not represent the actuarial equivalent of normal retirement income; 2) interpreted the Plan in a reasonable fashion; and 3) were prohibited from interpreting the Plan in the manner the plaintiffs are requesting. Therefore, defendant's actions are not subject to a fiduciary analysis. Any evidence of improper motive on the part of defendants is irrelevant.

Not only is the instant holding consistent with applicable case law, it also reaches a fair result. To allow the 4% rate would result in a substantial windfall to the plaintiffs compared to those beneficiaries receiving their annuity under normal retirement income. It would also jeopardize the viability of the Plan, particularly in times of high inflation and interest rates, and could threaten the security of present and future beneficiaries.

## III. SUMMARY JUDGMENT STANDARD

Fed.R.Civ.P. 56(c) defines the standard for summary judgment: courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), the Supreme Court interpreted Rule 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of his claim. Thus, the movant's burden is "discharged

857

by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Once the movant has met this burden, the opposing party must then present evidence establishing a material issue of fact. The nonmoving party must go beyond the pleadings and submit evidence in the form of affidavits, depositions, admissions and the like, to demonstrate that a genuine issue of material fact does exist. *Id.* at 324.

The Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), that "the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor". While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact". *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249–50, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510. Thus, the party opposing the summary judgment motion must come forward with specific evidence of every element essential to his case so as to create a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Rollins v. Techsouth, Inc.,* 833 F.2d 1525, 1528 (1987).

Plaintiffs have failed to meet the above standard as to both Counts I and II. They have not presented any evidence significantly probative from which a jury might return a verdict in their favor. Therefore, pursuant to Fed.R.Civ.P. 56(c) there is no genuine issue of material fact in this action and defendants are entitled to judgment on both Counts as a matter of law.

CONCLUSION

In sum, defendants' motion for summary judgment on Counts I and II of plaintiffs' complaint is GRANTED.

SO ORDERED.